James Edward LONG, Appellant,

v.

The STATE of Texas, Appellee.

No. 867–85.

Court of Criminal Appeals of Texas, En Banc.

July 1, 1987.

Campbell, J., filed opinion concurring in part and dissenting in part.

Frank Jackson, Bruce Anton, Dallas, for appellant.

Henry Wade, Dist. Atty. and John D. Nation, Kenneth Carden and Knox Fitzpatrick, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

DUNCAN, Judge.

### I.

The appellant was indicted for sexual abuse of a child as then proscribed by § 21.10, Tex. Penal Code.[1] Following a jury trial, the appellant was convicted and assessed the maximum punishment at that time permitted under the statute: twenty years in the Texas Department of Corrections and a $10,000.00 fine.

On appeal to the Fifth Court of Appeals the appellant claimed, *inter alia,* and most significantly, that the trial court's admis-

---

1. Now § 22.011 and § 22.021, Tex.Penal Code (Supp.1986–1987).

sion of a pre-trial videotaped interview of the complainant, as authorized by Art. 38.-071, § 2, V.A.C.C.P., was improper because the statute is an unconstitutional deprivation of his right of confrontation under the Sixth Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment. See: *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). And, is similarly unconstitutional under Art. I, § 10 of the Texas Constitution (1876). In a published opinion, *Long v. State,* 694 S.W. 2d 185, (Tex.App.—Dallas 1985, pet. granted), the Court of Appeals agreed with the appellant's contentions and decided that Art. 38.071, § 2, *supra* is patently and as utilized in the appellant's prosecution unconstitutional. Because there are conflicting Court of Appeals' opinions we granted the State's Petition for Discretionary Review to review that decision.[2]

According to the record, shortly before the appellant's trial, at the request of the District Attorney's Office, the assistant director of the Dallas Rape Crisis Center had a videotaped interview with the twelve-year-old complainant. During the taped interview, the complainant commented upon her relationship with the appellant and revealed a number of sexually related incidents occurring between her and the appellant. According to M___ P___, the appellant was her mother's boyfriend who had lived with them for some extended period of time. That her first sexual experience with the appellant occurred when she was about five and one-half years old. At that time, while the child's mother was working, the appellant took her into her mother's bedroom and "started sucking my vagina."

Then, utilizing anatomically correct dolls, the complainant revealed a sordid and disgusting series of sexual activities between her and the appellant that included both anal and oral sex, which occurred anywhere from two to seven times a day during the approximately three years he lived with the complainant and her mother.

At the appellant's trial, the videotape of the interview was admitted into evidence and played for the jury. Prior to the tape being admitted into evidence the appellant interjected an objection to the admissibility of the videotape essentially on the basis that it denied the appellant his right of confrontation.

After the videotape was displayed to the jury, the State called several witnesses, including the complainant's mother. Since their testimony is not pertinent to the issue confronting the Court it will not be summarized. Thereafter, the State rested its case in chief.

The appellant then testified. In summary, after recounting the events surrounding his arrest and a conversation he had with the complainant's mother, the appellant stated that the complainant's allegations were not true. He then testified to his prior relationship with the complainant and her mother, i.e., how long and when he lived with them. He also testified to certain additional matters not relevant to this appeal; therefore, that portion of his testimony will not be summarized.

On cross-examination, in addition to several other matters that are also not pertinent to this appeal, the appellant again denied ever engaging in anal or oral intercourse with the complainant.

The appellant's wife then testified essentially about their relationship and the appellant rested.

The State in rebuttal, pursuant to Art. 38.071, § 2(b), *supra* called the complainant, M___ P___ to testify. After preliminary questioning relative to her age, school

---

**2.** In addition to this case, the Courts in the following cases have declared Art. 38.071, § 2, *supra* unconstitutional: *Buckner v. State,* 719 S.W.2d 644 (Tex.App.—Fort Worth 1986, pet. filed); *Romines v. State,* 717 S.W.2d 745 (Tex. App.—Fort Worth 1986, pet. filed). In the following cases the Courts of Appeal found the statute constitutional: *Whittemore v. State,* 712 S.W.2d 607 (Tex.App.—Beaumont, 1986, pet. granted); *Mallory v. State,* 699 S.W.2d 946 (Tex. App.—Texarkana 1985, pet. granted); *Tolbert v. State,* 697 S.W.2d 795 (Tex.App.—Houston [1st] 1985, pet. granted); *Alexander v. State,* 692 S.W. 2d 563 (Tex.App.—Eastland 1985, pet. granted); *Jolly v. State,* 681 S.W.2d 689 (Tex.App.—Houston [4th] 1984, pet. granted); *Woods v. State,* 713 S.W.2d 173 (Tex.App.—Texarkana 1986, pet. filed).

attendance, and apparent nervousness the State began to ask questions more pertinent to the prosecution. At that point the appellant objected, asserting that the State's questioning was "improper rebuttal ... [and] nothing more than reiteration of what occurred on direct." The appellant's objection was overruled. The complainant then proceeded to relate essentially the same series of sexually related encounters with the appellant that had been recorded on the videotape and previously displayed to the jury. During her testimony the appellant again objected, this time, however, he claimed the testimony was "improper bolstering." The trial court also overruled this objection and the complainant's testimony continued. It is satisfactory and sufficient to note that the balance of her direct testimony was her recounting the same specific sexual experiences she had with the appellant that had already been displayed to the jury in the videotape.

On cross-examination the complainant recalled the videotape tape session, conversations she had with the prosecutor and a District Attorney's investigator, as well as who, what and when she told of the sexual abuse. Concluding his cross-examination the appellant asked the following question, that was answered as noted:

"Q. Okay. Now, M____, did you tell someone that back down in the past that the reason that you told your mother that you were having this type of relationship with Mr. Long here is because you didn't want them to get back together?

"A. Yes, that [sic] true."

On redirect the complainant claimed that she also told of the sexual abuse "because they were talking about getting back together, and I just went through so much pain and it hurt so bad, ..."

The appellant returned to the stand and reiterated that none of the sexual encounters with the complainant had occurred, and that he had requested her mother have the complainant physically examined.

At that point both sides rested and closed.[3]

## II.

At issue in this case is whether Art. 38.071, § 2, V.A.C.C.P. infringes upon a defendant's right to be confronted by his accusers as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Art. I, § 10 of the Texas Constitution.[4] Because of the very significant and controversial nature of this issue a thorough analysis of one's right of confrontation is necessary.

It is undeniable that the theory and principle of confrontation is indelibly linked to the practice of excluding from evidence hearsay statements. In fact, confrontation arose from the evolution of what we know as the hearsay rule. Historically, the judicial policy of excluding hearsay statements "as a distinct and living idea, ... [did] not gain a complete development and final precision until the early 1700s." Wigmore, *Wigmore on Evidence*, 3rd ed., vol. 5, p. 9 (Boston: Little, Brown and Co., 1940) [hereinafter referred to as *Wigmore* ].

At the inception of the procedure that was to ultimately become the jury trial (*circa* 1300's), the trial witness, as we perceive him today, was an unknown character. Instead, evidence was reviewed by the jury principally from previously designated witnesses who did not testify in open court. Rather, the jury solicited their knowledge, which they had acquired from some usually undisclosed source, and conferred with them privately. Consistent with that practice, in those disputes "where facts were

---

3. Prior to the charge being read to the jury, however, the State received permission to reopen for the purpose of showing "that there would be no medical evidence after a period of three months, of sexual abuse of a child involving anal intercourse...."

Outside the presence of the jury the State recalled its first witness, Jan Delipsey, to elicit such testimony.

After an extensive voir dire examination into the witness qualifications as an expert by the State, defense, and the judge, the State abandoned its efforts and closed.

No further evidence was offered by either party.

4. See also Art. 1.05, V.A.C.C.P.

involved which, as we should think, needed other testimony, the counsel stated them by allegations, and a special witness might or might not be present to sustain the allegation." *Id.*, p. 11. Therefore, as late as at the beginning of the sixteenth century it was common practice for a jury to obtain "evidence" from sources outside the court, including assertions of what another had said or would say.

Gaining in popularity at this time was the frequent use of ex parte depositions, both sworn and unsworn. During this period of time, however, these methods of acquiring evidence were also being sincerely questioned. Nevertheless, the practice persisted.[5]

By the 1680's the wholesale acceptance of hearsay statements had fallen into disfavor and excluding such evidence was quickly becoming common practice. Although, according to Wigmore, "[n]o precise date or ruling stands out as decisive ...," *Id.*, p. 16, it is generally accepted that the hearsay rule became established "between 1675 and 1690." *Id.*

The hearsay rule came about principally because the former methods of obtaining evidence failed to protect one against errors or untrustworthiness. One means of exposing these deficiencies was the procedure of cross-examination in which the adverse witness' statements were scrutinized. It has been stated that "many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross-examination." *Id.*, p. 3. Thus, the principal purpose of the hearsay rule and the primary factor responsible for the doctrine's evaluation and acceptance was that it ensured the right of cross-examination. Accordingly, the fundamental purpose of the rule, at least historically, was to provide an opportunity to cross-examine the witness.

Going hand-in-hand with the development of the hearsay rule was the concept of physical confrontation, or the right of having the witness present for the purpose of cross-examination. As the hearsay rule became entrenched in English common law so did the means of accomplishing its primary purpose (cross-examination): physical confrontation. Thus, although "the main idea in the process of confrontation is that of the opponent's opportunity of cross-examination; the former [physical confrontation] is merely the dramatic feature, the preliminary measure, appurtenant to the latter." *Id.*, p. 124.

This is not to ignore, however, the substantial benefit that can be derived by requiring witnesses to present themselves for cross-examination. That is, the trier of fact is given the opportunity of observing the demeanor of the witness and may draw whatever appropriate subjective conclusions that can be associated with that observation. With the witness physically present the witness' credibility can be judged not from just what is said, but how it is said. In judging the credibility of a witness this is a most valuable right.

So, historically, the right of confrontation has essentially two purposes. First and foremost is that it affords the accused the opportunity of cross-examination. Second, and almost incidental to cross-examination, is physical confrontation. Therefore, again in at least historical terms, "[i]f there has been a cross-examination, there has been a confrontation." *Id.*, p. 127. In other words, the right to a witness' physical presence was secondary to the necessity of one being given the opportunity to cross-examine the witness.

While the hearsay rule was in its early stages of development so too was the colonization of America at Jamestown and Plymouth Rock. There is no doubt that the Crown intended that English law was to move with the colonists across the Atlantic to their new home in America. For exam-

---

5. The right of a defendant to confront complaining witnesses essentially begins with the public's reaction to Sir Walter Raleigh. Sir Walter Raleigh was convicted of treason after trial by affidavit, without ever being allowed to con-front his accusers. See: Graham, "The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another," 8 *Crim.L.Bull.* 99 (1972).

ple, the patents Queen Elizabeth granted to Gilbert and Raleigh contained statements "that the colonists settled under these grants should possess the same constitutional rights as were enjoyed by Englishmen in the homeland." Heller, *The Sixth Amendment to the Constitution of the United States: A Study in Constitutional Development* (Greenwood Press: New York, 1969), p. 13–14. However, the colonial experience produced some divergencies from the law of England.

One departure the colonists made from the English law that is particularly significant was the colonies' adoption of Europe's system of the public prosecutor. The result of this action "was that, at a time when virtually all but treason trials in England were still in the nature of suits between private parties, the accused in the colonies faced a government official whose specific function it was to prosecute...." *Id.*, p. 21. The practical effect of such prosecutorial authority was that the government would have a substantial advantage over a defendant "unless extreme vigilance was practiced to safeguard the precarious privileges so recently granted to the accused." *Id.*

These "privileges" were so valued that the Continental Congress in 1774 declared that the colonies were entitled to them. In fact, as early as 1776 the Declaration of Rights of Maryland, in addition to declaring that its citizens were entitled to the common law of England, also stated that they were entitled to a trial by jury and "the rights which every man had in criminal proceedings: ... to be confronted with the witnesses against him...." *Id.*, p. 22.

The right of confrontation had become a part of accepted criminal procedure in the colonies even prior to the American Revolution.[6] This is reflected in the North Carolina Constitution: "in all criminal proceed-

ings, every man has a right to ... confront the accusers." *Id.* The Virginia Bill of Rights similarly guaranteed that an accused has a right "to be confronted with the accusers and witnesses...." *Id.*, p. 23. The Declaration of Rights of Massachusetts and the Bill of Rights of New Hampshire contained identical rights, including that of confrontation.

Although the details of criminal procedure were not embodied in the draft constitution submitted to the Constitutional Convention delegates in 1787, it was not very long afterwards that a cry for a Bill of Rights was being heard. There was a great deal of opposition to the proposed Constitution because it did not contain a Bill of Rights, a part of which would ensure certain accepted criminal procedures. For example, in one of the *Anti-Federalist* papers, which opposed the proposed constitution, it was stated: "For the security of life, in criminal prosecutions, the bills of rights of most of the states have declared, that no man shall be held to answer for a crime until ...—the witnesses against him shall be brought face to face...." Kammen, *The Origins of the American Constitution: A Documentary History* (Viking Penguin Inc.: New York, 1986), p. 315–316.

The Constitution was ratified without a Bill of Rights. However, it achieved ratification "only because crucial states where ratification had been in doubt, were willing to accept the promise of a bill of rights in the form of subsequent amendments to the Constitution." Levy, *Constitutional Opinions: Aspects of the Bill of Rights* (Oxford University Press: New York, 1986), p. 117.

The nucleus of the Bill of Rights was the various state constitutions that were developed after America became independent. At the time of the Convention twelve states

**6.** The Puritans who settled in Massachusetts had a low opinion of lawyers and did not permit the practice of law in the colonies. Consequently, many of the principles of English common law were not applicable to their criminal justice proceedings. For example, at the Salem witch trials in 1692 the numerous defendants did not enjoy the presumption of innocence, they obviously were not entitled to counsel and jury

verdicts were only advisory. It is rather interesting to note, however, that all of the possessed children were required to come into court and in the presence of the defendant witch detail the sorcery. Thus, the one right that even the alleged witch did enjoy was the right of confrontation. For a detailed description of the Salem witch trials see: Marion Starkley, *The Devil in Massachusetts* (New York, A.A. Knopf: 1949).

had produced constitutions. None of the state constitutions, however, included as comprehensive a bill of rights which recognized the guarantees that evolved into the first ten amendments. The one thing the various state constitutions did have in common, however, was that they all secured the right to trial by jury and this included the right to be confronted by one's accusers. Some, such as Virginia's Constitution of 1776, failed to protect freedom of speech, ensure the writ of habeas corpus, or guarantee the right to grand jury proceedings. Pennsylvania's bill of rights was more comprehensive than Virginia's, but it failed to, among other things, ban excessive fines and cruel punishments. But even these states, who overlooked or rejected several of our most treasured values, did not ignore or reject the right of confrontation.

Almost passively the right of confrontation found its way into every document that could be considered the forerunner of the Constitution. The necessity of its inclusion into the Constitution was apparently viewed to be simply absolute and so it was that confrontation became one of the guarantees accorded accused individuals. Its incorporation was apparently a foregone conclusion that generated no serious debate among the delegates simply because the right to confront one's accusers is one of the fundamental guarantees of life and liberty. It was thought: because "the rights of the criminally accused are legitimate defenses of the individual against government, [and] because the enduring interests of that society require justice to be done as fairly as possible," *Id.* at 134, the right of confrontation must be explicitly protected. And so it was.

On June 8, 1789, James Madison introduced the Bill of Rights in Congress. On September 26, 1789, Congress adopted the Bill of Rights and submitted them to the states for ratification. On December 15, 1791, Virginia ratified the Bill of Rights and they became a part of the Constitution.

### III.

The right of confrontation, as a state guaranteed right, has a history that parallels that of Texas as an independent republic, and later as a state. For example, the Constitution of the Republic of Texas includes, under the title "Declaration of Rights," the following:

> Sixth. In all criminal prosecutions the accused ... shall be confronted with the witnesses against him, .... See: Sayles, *The Constitution of the State of Texas* (E.H. Cushing: Houston, 1872), p. 173.

In 1845 the new State of Texas adopted the first of several successive constitutions. It continued the guarantee of confrontation, *Id.*, p. 186. On February 1, 1861 an "ordinance" was adopted at a state convention which seceded Texas from the United States. After becoming a part of the Confederate States of America, Texas adopted a new constitution. It also continued the policy of guaranteeing to accused persons the right of confrontation[7] (Art. I, § 8). *Id.*, p. 226.

Following the Civil War the Constitution of 1861 was amended in 1866 at a convention in Austin. The guarantee of confrontation was not disturbed (Art. I, § 8). *Id.* at 300. However, the government organized under the 1866 Constitution was not approved by the Congress of the United States. Consequently, another Constitution, which was later approved by Congress, was ratified in July, 1869. That Constitution also included the right of confrontation (Art. I, § 8) *Vernon's Texas Const. Ann.*, "Early Constitutions and Organic Laws," vol. 3, p. 640 (1955).

In 1876 the people of Texas ratified the present Constitution. The confrontation clause in the present Constitution provides:

> Sec. 10. Rights of Accused in Criminal Prosecution.
>
> In all criminal prosecutions the accused ... shall be confronted by the witnesses against him.... Art. I,

---

7. The Constitution of the Confederate States of America also included the right of confrontation

(Art. I, § IX, paragraph 17). *Sayles, supra,* p. 287.

§ 10, *Texas Constitution*.[8]

The right of confrontation enacted in the earliest of the Texas Constitutions actually was consistent with an express provision that "in all criminal cases the common law shall be the rule of decision." Art IV, § 13 *Republic of Texas Constitution* (1836). Therefore, the same right of confrontation that was adopted by the thirteen original United States in 1787 found its way to Texas by 1836.[9] What came with this very valuable right were the interpretations and exceptions that had been impressed upon it in England. Accordingly, in its historical evolution the main and essential purpose of confrontation was to secure for the accused the opportunity of cross-examination. Secondary to that purpose, however, was the presence of one's accuser in court. These distinct purposes were the foundation of the rule because common law never recognized as absolute the right to physically face one's accusers. The right of cross-examination, however, was viewed as indispensable. These purposes or distinctions were necessarily adopted when the theoretical principle of confrontation was later adopted in Texas.

As stated, confrontation was not without its limitations and exceptions. Even the "indispensable" right of cross-examination "involved the idea of exceptions, and the Constitution makers endorsed the general principle merely as such." *Wigmore, supra* at 130. And, as noted, actual physical confrontation was not ever absolute—it was generally viewed as a viable means to reach the indispensable end. In other words, by requiring an accuser's presence in court the opportunity of cross-examination is necessarily attained.

In its evolution as a form of guaranteeing cross-examination numerous exceptions were impressed upon the hearsay rule. If an exception was applicable then the denial of cross-examination was forgiven. The early exceptions were based upon two considerations: a necessity for the evidence and the probability of it being trustworthy. Necessity could, in most instances, be equated with a witness being dead or otherwise legally unavailable. The probability of its trustworthiness was actually a shorthanded rendition of asserting that when experience indicates that under certain circumstances the accuracy of the evidence would not be adversely affected by cross-examination it was sufficiently reliable. In other words, certain types of hearsay information is normally accurate and valid to the extent that the purpose of cross-examination would not be served by subjecting it to cross-examination. Consequently, such evidence will be admissible even though cross-examination does not occur. As a result, dying declarations, reputation, and business records, among numerous other

---

**8.** The latter portion of the Texas Confrontation Clause provides as follows: "except that when the witness resides out of the State and the offense charged is a violation of any of the anti-trust laws of this State, the defendant and the State shall have the right to produce and have the evidence admitted by deposition, under such rules and laws as the Legislature may hereafter provide."

This is one of the few amendments made to the Texas Bill of Rights. It was adopted in 1917, and obviously applies only to violations for state anti-trust laws. According to one authority, "A search of historical records failed to turn up any clear reason for the amendment." Seth S. Searcy III, "Bill of Rights: §§ 9 & 10," in *The Constitution of the State of Texas: An Annotated and Comparative Analysis*, ed. George D. Braden (n.p.: n.p., 1977), vol. 1, p. 36.

**9.** It is relevant at this point to note that the syntax of the confrontation clause in Art. I,

§ 10, *Texas Constitution* (1876) is easily susceptible to a more affirmative and vigorous interpretation than the comparable confrontation clause of the Sixth Amendment. The right of confrontation guaranteed under the Sixth Amendment is presented in a more or less passive style: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him; ..." Whereas, Art. I, § 10 is arguably more emphatic: "In all criminal prosecutions the accused ... shall be confronted by the witnesses against him." Or, Art. I, § 10 is framed, not "in terms of rights granted, but in terms of clear mandate [sic] that the accused 'shall be confronted'...." by the witnesses against him. Miller, "Does the Child Witness Videotape Statute Violate the Confrontation Clause?: Article 38.071, Texas Code of Criminal Procedure," 17 *Tex.Tech.L.R.* 1669 (1986) at 1681.

exceptions,[10] are admissible even though neither the opportunity for cross-examination nor physical confrontation have occurred.

## IV.

In 1895 the United States Supreme Court examined the confrontation clause in *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). In *Mattox* the defendant had originally been convicted of murder. That conviction had been reversed and remanded for a new trial. Prior to the new trial both of the government's prosecution witnesses died. During the second trial, over the defendant's objection, "a transcribed copy of the reporter's stenographic notes ...," *Id.* at 240, 15 S.Ct. at 338, of the dead witnesses' previous trial testimony was admitted into evidence.

Concluding that the "rights of the public ...," *Id.* at 241, 15 S.Ct. at 339, would not be served by declaring such evidence inadmissible, the Court identified the purpose of the confrontation clause in the Sixth Amendment. The Court stated:

> The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and gauge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. *Id.* at 242–243, 15 S.Ct. at 339–340.

In *Mattox v. United States, supra* the historical and primary purpose of the right of confrontation was given judicial approval. Continuing to adhere to such recognition the Supreme Court in *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), commented that the right of cross-examination is "one of the safe-guards essential to a fair trial." *Id.* at 692, 51 S.Ct. at 219. See also: *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

Further, in *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), while conceding the inferior aspect of physical confrontation, the court stated: "Our cases construing the clause hold that a primary interest secured by it is the right of cross-examination; an adequate opportunity for cross-examination may satisfy the clause even in the absence of physical confrontation." *Id.* at 418, 85 S.Ct. at 1076.

The commitment of the Supreme Court to ensuring confrontation, or more accurately the opportunity for cross-examination, as guaranteed by the Sixth Amendment, is particularly evident in *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965). In summary, *Pointer v. Texas, Id.,* imposed the Sixth Amendment right of confrontation upon the States by the operation of the Fourteenth Amendment. Briefly, in *Pointer* the defendant and another were charged with robbery; at an examining trial the complainant testified that the defendant and his co-defendant robbed him at gunpoint. Inasmuch as neither defendant was represented by counsel no effective cross-examination occurred. The defendants were later indicted; however, prior to their trial the complaining witness moved to California with no intention of returning to Texas. With this information as a predicate, the trial court admitted the complainant's examining trial testimony into evidence over the objection of the defendant. Understandably, the defendant was convicted.

After this Court affirmed his conviction the Supreme Court held that "the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the State by the Fourteenth Amendment." *Id.* at 403, 85 S.Ct. at 1067.

Emphasizing the necessity of the opportunity for cross-examination, the Supreme Court simply concluded that under the

---

**10.** See *Tex.R.Crim.Evid.,* R. 803 and R. 804.

facts the defendant was not provided with "an adequate opportunity to cross-examine Phillips [the complainant]...." *Id.* at 407, 85 S.Ct. at 1069. Accordingly, the defendant's conviction was reversed.

The inarguable recognition is that the opportunity of cross-examination as the principle laying at the foundation of the Sixth Amendment right of confrontation has enjoyed a consistent commitment by the United States Supreme Court. Quite recently, the Supreme Court reiterated this perception of the confrontation clause by commenting:

> The opinions of this Court show that the right of confrontation is a *trial* right, designed to prevent improper restrictions on types of questions that defense counsel may ask during cross-examination.
>
> .   .   .   .   .
>
> In short, the confrontation clause only guarantees 'an *opportunity* for effective cross-examination,....' *Pennsylvania v. Ritchie,* —— U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40, 40 Cr.Law Rept. 3277 (1987).

But, physical confrontation has not been ignored by the Supreme Court. For example, a somewhat recent per curiam opinion of the Court included these rather clear comments:

> This Court's Confrontation Clause cases fall into two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination. The first category reflects the Court's long-standing recognition that the "literal right to 'confront' the witness at the time of trial ... forms the core of the values furthered by the Confrontation Clause." *Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985).

Understandably, there have been no cases decided by the United States Supreme Court that authorizes the practice of that which the Sixth Amendment's Right of Confrontation was created to exclude: "depositions or ex parte affidavits...." *Mattox v. United States, supra.*

Obviously, and as previously noted, exceptions to this right, however, have arisen and been approved by the Supreme Court. For example, in *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) the statements of a witness that were made at a preliminary hearing, then subject to cross-examination, were admissible at the defendant's trial as a prior inconsistent statement. In *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) the Supreme Court held that testimony subject to cross-examination at a previous trial was admissible when the witness was out of the country.

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court again visited the Sixth Amendment and its Confrontation Clause and although an exception was recognized nonetheless emphasized its commitment to the opportunity for cross-examination. Factually, the defendant was arrested and charged with forgery. At his preliminary hearing he called as a witness the complainant's daughter anticipating that she could testify that she had authorized his execution of the check. However, she did not do this. Rather, she denied she gave the check to the defendant.

At his trial the defendant testified as he had anticipated the complainant's daughter would have, i.e., she had given him her father's checkbook and had permission to do so. During the interim between the defendant's arrest and his trial the complainant's daughter had moved and her whereabouts were unknown. As a result, the State offered a transcript of the daughter's testimony pursuant to a state statute authorizing the admissibility of such evidence to rebut the complainant's testimony. The defendant claimed that his right of confrontation was violated by admitting such statement.

In reviewing this case the Supreme Court again recognized the role of confrontation in the Constitution by observing that "[t]he Court has emphasized that the confrontation clause reflects a preference for face-to-face confrontation at trial, and that 'a primary interest, secured by [the Sixth

Amendment] is the right of cross-examination.'" *Id.*, at 63, 100 S.Ct. at 2537. This predisposition is based primarily upon the principle that the absence of the opportunity to test the truthfulness and accuracy of a witness' testimony (cross-examination) is "so important that the absence of proper confrontation at trial 'calls into question the ultimate integrity of the fact-finding process.'" *Id.*, at 64, 100 S.Ct. at 2538. Continuing, the court noted, however, that public interest may demand deviations from a literal interpretation of the language of the Sixth Amendment and as a result of the public interest exceptions are born and gradually evolve. These exceptions, on the other hand, are only applicable when established guidelines are met. First, relative to hearsay statements, a "rule of necessity," *Id.*, at 65, 100 S.Ct. at 2538 is imposed. Thus, even in those instances where cross-examination has previously occurred "the prosecution must either produce, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant." *Id.*, before the hearsay statement will be deemed admissible. Second, if it is proven that the witness is unavailable, "the Clause [confrontation] countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Id.* There must, therefore be, as noted in *California v. Green, supra*, some "indicia of reliability," *Id.*, before the hearsay testimony will be admitted into evidence, even if the witness is unavailable.

In some instances, according to the court, this indicia of reliability can be assumed, provided "the evidence falls within a *firmly rooted* [emphasis added] hearsay exception." *Id.*, at 66, 100 S.Ct. at 2539. In other instances the evidence must be excluded "absent a showing of particularized guarantees of trustworthiness." *Id.*

Again citing and in essence relying upon the principles announced in *California v. Green, supra*, the Court observes "that the *opportunity* to cross-examine at the preliminary hearing—even absent actual cross-examination—satisfies the Confrontation Clause." *Id.*, at 70, 100 S.Ct. at 2541.

This, taken in conjunction with the prosecution proving that the witness was unavailable rendered the transcribed testimony admissible.

■ In summary, *Ohio v. Roberts, supra*, is supportive of the proposition that for prior testimony to be admissible there must be proof that the witness was unavailable and there had been a previous opportunity for cross-examination. If, however, the witness is available, irrespective of the "indicia of reliability" otherwise present in her statements, the "purposes behind the confrontation requirement," *California v. Green, supra*, are not achieved by dispensing with the right of face-to-face confrontation. Although the opportunity for cross-examination is the dominant concern of the confrontation clause, the physical presence of an accuser is not so subservient that it can be ignored. Nor, will it be.

*Ohio v. Roberts, supra*, is consistent with the Supreme Court's comments in *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). In that case the Court held that the preliminary hearing testimony of a co-defendant was inadmissible, irrespective of a previous waiver of cross-examination, because the State failed to show the co-defendant was actually unavailable.

## V.

The ratification of the federal Bill of Rights was an exercise to limit the power and authority of the federal government. It was not the original intent of the delegates to the second Congress to create any limitation upon the authority of the thirteen states to regulate conduct within their borders. The Fourteenth Amendment obviously changed that. However, it was not until *Pointer v. Texas, supra*, that the Sixth Amendment was expressly applied to the States. Therefore, prior to 1968 and *Pointer, supra*, the only source that guaranteed confrontation to Texas' defendants were those provisions in Texas' several constitutions, most recently that of 1876.

Nevertheless, the interpretation given to Art. I, § 10 of the Texas Constitution closely parallels the evolution of the Sixth Amendment as interpreted by the United States Supreme Court. The reason that the guarantees are so identifiable goes beyond the similar language, that is, the source of the right of confrontation is the same: English common law. Dissenting in *Cline v. State*, 36 S.W. 1099 (1896) (Dissenting Opinion, 37 S.W. 722), Judge Henderson supports his opinion that examining trial testimony is admissible when the witness is dead by noting that in England such evidence is admissible and the right of confrontation "came to us as understood and defined in England...." *Id.* at 724. He further noted that the right of confrontation "is not, however, a stiff, unbending rule, extending to any case without exception,...." *Id.* at 726. And, rather persuasively he continues:

I apprehend no one will dare question at this day that when the amendment to the constitution of the United States on this subject was adopted, and when the states of the Union adopted that part of their constitutions requiring 'in all criminal prosecutions that the defendant be confronted by the witnesses against him,' it was done with reference to and having in view the rule on the subject in Great Britain. *Id.*, 727.[11] *Contra: Cline v. State*, [36 Tex.Cr.R. 320] 36 S.W. 1099 (Tex.Cr.App.1896) [this is the majority opinion].

See also: *Kemper v. State*, 138 S.W. 1925 (Tex.Cr.App.1925).

The Texas Confrontation Clause has thus evolved to a great extent because of the influence of the English common law. This is evident by the Texas courts' recognition of the superior role that the opportunity for cross-examination plays in the right of confrontation. *Garcia v. State*, 151 Tex. Cr.R. 593, 210 S.W.2d 574 (1948). However, one should not simply assume that the courts in reviewing claims of violations of the Texas Constitution's right of con-

frontation were mere mimics of the common law. To the contrary, the factual settings in which it was claimed that one's confrontation rights were abused necessitated independent and at times courageous opinions.

In 1948, for example, this Court was faced with deciding whether a Mexican national, charged with murder, who could not speak English, was entitled to an interpreter under Art. I, § 10 of our Constitution. As absurd as it may now appear the Court initially responded in the negative. However, on the Appellant's Motion for Rehearing the Court stated:

[T]hey [defendants] are entitled to be confronted by the witnesses under the same conditions as apply to all others. Equal justice so requires. The constitutional right of confrontation means something more than merely bringing the accused and the witness face to face, it embodies and carries with it the valuable right of cross-examination of the witness. *Garcia v. State*, supra, 210 S.W.2d at 580.

Accordingly, the Court imposed through constitutional interpretation the necessity of furnishing an interpreter to a defendant who cannot speak English.

Indeed, consistent with the principal purpose of the confrontation clause: "to prevent depositions or ex parte affidavits," *Mattox v. United States, supra*, as far back as 1887 the old Court of Appeals reversed a conviction that was obtained through the use of a telegram sent by a witness who was not present in court. *Chester v. State*, 23 Tex.App. 577, 5 S.W. 125 (1887). Chronologically progressing, in *Hays v. State*, 73 Tex.Cr.R. 58, 164 S.W. 841 (1914) this Court reversed a murder conviction because the trial court admitted into evidence two written witness' statements as original evidence. The Court tersely stated: "Appellant was entitled to be confronted by these witnesses and have them testify to the facts." *Id.* at 842.

---

**11.** The issue regarding the admissibility of examining trial testimony has been on a merry-go-round since *Greenwood v. State*, 35 Tex. 587 (1871), but resolved (hopefully) as recently as

1980 in *Russell v. State*, 604 S.W.2d 914 (Tex.Cr. App.1980). A brief but telling history of this issue is related by Judge Clinton in footnote 5 of that opinion.

Later, in *Newton v. State*, 292 S.W. 247 (Tex.Cr.App.1927) another conviction was reversed because of the erroneous use of written statements when there was no suggestion that the witness was unavailable.

Eleven years later in *Walding v. State*, 135 Tex.Cr.R. 430, 120 S.W.2d 1052 (1938) it was decided that because of the defendant's right of confrontation the State could not prove the essential elements of the old adultery statute (Penal Code 1925, Art. 500) by introducing into evidence the inculpatory ex parte affidavit of the allegedly involved woman. See also: *Estes v. State*, 162 Tex.Cr.R. 122, 283 S.W.2d 52 (1955).

Similar to the United States Supreme Court, this Court has also recognized and continues to approve exceptions to the right of face-to-face confrontation. For example, the regularly maintained business record exception to the hearsay rule is applicable to criminal cases. *Phillips v. State*, 538 S.W.2d 116 (Tex.Cr.App.1976). But even in the case of a well-recognized exception to the hearsay rule this Court has mandated that every case be considered on its own merits. In *Porter v. State*, 578 S.W.2d 742 (Tex.Cr.App.1979), appeal after remand, 623 S.W.2d 374 (Tex.Cr.App.1981), cert. denied, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982) the Court conceded that the Business Records Act, as a recognized exception to the hearsay rule, was applicable to criminal cases. But, the Court imposed the indicia of reliability consideration upon the Business Records Act by stating: "It must be determined in each instance whether the particular record is of such trustworthiness as to guarantee the same protection provided by the constitutional rights of confrontation and cross-examination." *Id.*, 747. Accord: *Coulter v. State*, 494 S.W.2d 876 (Tex.Cr.App.1973).

■ This Court's imposition of the "indicia of reliability" standard upon a well-established exception to the hearsay rule is simply indicative of our determination that intrusions upon a defendant's state guaranteed right of confrontation must be considered on a case-by-case basis to ensure that the "integrity of the fact-finding pro-

cess," *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973), is constitutionally maintained.

## VI.

Focusing our attention on the challenged statute, Art. 38.071, § 2, V.A.C.C.P., provides as follows:

Sec. 2. (a) The recording of an oral statement of the child made before the proceeding begins is admissible into evidence if:

(1) no attorney for either party was present when the statement was made;

(2) the recording is both visual and aural and is recorded on film or videotape or by other electronic means;

(3) the recording equipment was capable of making an accurate recording, the operator of the equipment was competent, and the recording is accurate and has not been altered;

(4) the statement was not made in response to questioning calculated to lead the child to make a particular statement;

(5) every voice on the recording is identified;

(6) the person conducting the interview of the child in the record is present at the proceeding and available to testify or be cross-examined by either party;

(7) the defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

(8) the child is available to testify.

As is patently obvious, this statute basically authorizes a significant departure from established trial procedure by dispensing with the requirement that the prosecution develop its case in chief in the courtroom, in the presence of the judge, jury, and the defendant. As it is a substantial modification of recognized trial procedure the motive that produced such alteration of established procedures was similar-

ly substantial and well intended.[12] According to Senator Hugh Parmer (D–Fort Worth), sponsor of S.B. 836 (Art. 38.071, *supra* ), the bill was in response to increased incidents of reported sexual abuse of children and the "many, many times ...," Testimony, April 19, 1983, the child victim is emotionally and physically unable to testify. S.B. 836, according to Senator Parmer "attempts to address that problem...." *Id.* The intent of the bill in its initial form was to preserve the statement of a child sexual abuse victim, provide a procedural means for it to later be admissible in evidence and collaterally create a procedure that accommodates the absence of the victim from the courtroom.

Apparent to Senator Parmer and other supporters of the bill was the possibility that the bill in its original form intruded upon a defendant's right of confrontation. In an effort to alleviate such a challenge an amendment to the bill was added. It provides:

> If the electronic recording of the oral statement of a child is admitted into evidence under this section, either party may call the child to testify and the opposing party may cross-examine the child. Art. 38.071, § 2(b), *supra.*

In other words, the intent of the bill was to provide the state a means of introducing the statement of a child accusing a defendant of sexual abuse without the necessity of calling the child as a witness. This was supposed to have protected the child from the trauma of confronting the abuser in an intimidating courtroom atmosphere. However, the bill includes a provision that seems to nullify that portion of the bill that protects the child from the courtroom by requiring the child to testify in the courtroom at the insistence of either the State or the defendant. Thus, the purpose of the statute, at least in part, is subverted by the operation of the statute.

A divergence from face-to-face confrontation has received judicial approval in only two instances: first, when the exception is a well-recognized exception to the hearsay rule (understandably, the State does not argue or even suggest that is a basis for approving the statute). The second instance in which an infringement on literal confrontation is judicially condoned is when public necessity is evident and that is coupled with the testimony having an indicia of reliability. In this context necessity simply means that the witness is unavailable to testify, *Ohio v. Roberts, supra,* and indicia of reliability exists when a prior opportunity for cross-examination has occurred. *California v. Green, supra.*

As noted, under Art. 38.071, *supra,* necessity, in the sense of unavailability, is obviously not a consideration and the idea of acquiring the testimony in a "neutral, safe environment ...," Ann French Clark, Senate Jurisprudence Committee, April 19, 1983, absent cross-examination is certainly not indicative of the testimony having an indicia of reliability. This is so because it was recognized long ago that cross-examination is a defendant's opportunity of "not only testing the recollection [of the witness] and sifting through the conscience of the witness, but of compelling him to stand

**12.** Numerous other states have enacted statutes that authorize videotape testimony in sexual abuse of children prosecutions. Since the various states' legislatures are continuously active in this area the following list may be incomplete: Alabama: 1985 Ala.Acts No. 85–743; Alaska: Alaska Stat. § 12.45.047 (1984); Arizona: Ariz. Rev.Stat.Ann. § 13–4235 (1985); Arkansas: Ark. Stat.Ann. §§ 43–2035 to 2037 (1985); California: Cal.Penal Code § 1346 (West 1985); Colorado: Colo.Rev.Stat. § 18–3–413 (1984); Connecticut: 1985 Conn.Acts 85–587 Jan. Sess.; Delaware: Del.Code Ann. tit. 11, § 3511 (1985); Florida: Fla.Stat. § 90.90 (West 1984); Act of May 30, 1985, ch. 85–53, § 92.53, Fla.Laws 140, 146 (redesignated from § 90.90); Kansas: Kan.S.B. No. 107, 1985 Regular Session; Kentucky: Ky. Rev.Stat. § 421.350 (1984); Maine: Me.Rev.Stat. Ann. tit. 15 § 1205 (1985); Missouri: H.R. 366, 83rd Gen.Assembly 1st Sess., 1985 Mo.Legis.Service 20, 61–69 (Vernon); Montana: Mont.Code Ann. § 46–15–401 to 403 (1977); Nevada: Act of June 3, 1985, ch. 462, 1985 Nev.Stat. 1423; New Hampshire: N.H.Rev.Stat.Ann. § 517:13–a (1985), New Mexico: N.M.Stat.Ann. 30–9–17 (1984); New York: N.Y.Crim.Proc.Law § 190.32 (Consol.1984); Oklahoma: Okla Stat. Ann. tit. 22, § 753 (West 1984); Rhode Island: R.I.Gen.Laws § 11–37–13.1 (1985); South Dakota: S.D.Codified Laws Ann. § 23A–12–9 (1985); Utah: Utah Code Ann. § 77–35–15.5 (1985); Vermont: Vt.R.Evid. 807; Wisconsin: Wis.Stat. § 967.04(7) (1985).

face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives testimony whether he is worthy of belief." *Mattox v. United States, supra,* 156 U.S. at 242, 15 S.Ct. at 339.

Although the electronic advances that this statute attempts to utilize operates to make this a case without state precedents, this is not the first occasion this Court has had to weigh the rights of a child victim with those of the defendant's right of confrontation. In *Vasquez v. State,* 167 S.W. 2d 1030 (Tex.Cr.App.1942) the defendant was convicted of raping an eight-year-old child and was given the death penalty. The principal evidence against the defendant was not the child's testimony because she was not called as a witness. The child's grandmother was called as a witness and testified to the child's condition, appearance, and what the child told her the defendant had done to her.

Interestingly, the Court reviewed the failure of the child to testify not only as a violation of the defendant's right of confrontation but also in the nature of insufficient evidence. Dispensing with the latter consideration, which is obviously irrelevant to our present concern, the Court noted that:

> The little girl was nervous and excited and this was relied upon as a reason for the State not offering her as a witness, though she was an unusually smart child. We do not believe that it is sufficient under the facts stated to defeat the right of the accused to be confronted by the witness against him. *Vasquez v. State, Id.* at 1032.

What the court condemned in *Vasquez, supra,* is essentially what Art. 38.071, § 2, *supra,* was enacted to accomplish—except in more pervasive terms.

The State urges the Court to approve the admissibility of the videotape statute on the basis of a compelling state interest—the protection of children. We do not question the explosive number of child sexual abuse cases that have been reported over the last several years.[13] Nor, do we doubt that in some instances trauma to a child does result by the child testifying in open court in the presence of the accused.[14] The literature and what little statistical evidence is available support such assertions.

■ However, prior to taking the massive step of suspending a constitutional right by impressing an exception upon it on the basis of a compelling state interest there must be evidence that the interest of the public in a specific case substantially outweighs the established constitutional right of the defendant. As the United States Supreme Court has stated: although the right of confrontation is not absolute, and can be infringed upon when necessary, before doing so the " 'integrity of the fact finding process' requires that the competing interests be closely examined." *Chambers v. Mississippi, supra.* While it is true that the action of the legislature in enacting the videotape statute was an effort to achieve a legitimate end, the protection of child victims as witnesses, it is equally true that a legitimate end in and. of itself can never be an acceptable motive for diminishing constitutional rights. If such a basis were to be condoned then the principle of constitutional rule would be subservient to the will of the legislature.

Since *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803) the authority of the courts to review legislation in its relation to constitutional dictates is axiomatic. However, this is an area that courts are understandably reluctant to exercise their authority. Notwithstanding our concession that the legislature's motives in enacting Art. 38.071, § 2, *supra* were valid, it is a basic principle of constitutional review that the wisdom and reasonableness

---

**13.** See: *State v. Myatt,* 237 Kan. 17, 697 P.2d 836 (1985) citing the alarming statistical information detailed in Note, "A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases," 83 *Colum.L.Rev.* 1745 (1983); McAllister, "Article 38.071 of the Texas Code of Criminal Procedure: A Legislative Response to the Needs of Children in the Courtroom," 18 *St. Mary's L. Journal,* 279 (1986).

**14.** Parker, "The Rights of Child Witnesses: Is the Court a Protector or Perpetrator?," 17 *New Eng.L.Rev.* 643 (1982).

of legislation is something that will not be considered. See: 12 Tex.Jur.3rd *Constitutional Law* § 30 (1981). What will be considered is whether the legislation is violative of any federal or state constitutional provision. There is no question that at times and under certain circumstances legislation that intrudes upon fundamental rights is acceptable. *Mattox v. United States, supra.* When legislation does limit these fundamental rights such acts can be justified only by a compelling state interest. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Further, a statute that encroaches upon a fundamental right, even if there is a compelling state interest supporting it, "must be narrowly drawn to express only the legitimate state interests at stake." *Id.* at 156, 93 S.Ct. at 728.

In *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) the Supreme Court declared unconstitutional an Arkansas statute that required all school teachers, as a condition of employment, to annually file a sworn statement of every organization the teacher belonged or contributed to over the preceding five years. Similar to our conceding the legitimate interest of the legislature in the present case, the Supreme Court conceded that a state has a legitimate interest in investigating the competence and fitness of teachers. However, according to the Court this statute went too far. Accordingly, it stated:

> [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose. *Id.*, 364 U.S. at 488, 81 S.Ct. at 252.

Legitimate legislative action will not survive a constitutional scrutiny if it utilizes a means that is unnecessarily broad in its invasion of fundamental rights. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Unquestionably in specific cases a compelling state interest will exist to a degree sufficient to create a necessity that requires a diminution of a defendant's right of confrontation. But, this necessity must be the practiced equivalent of a witness' unavailability. In such a case the Sixth Amendment and Art. I, § 10 of the Texas Constitution could bend. But a statute that is not individualized to a particular prosecution and on its face and in its operation assumes that confrontation in a particular class of cases will produce unnecessary trauma is constitutionally unacceptable.

In *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) the Supreme Court reviewed the constitutional propriety of a Massachusetts statute that required, "under *all* [emphasis added] circumstances, the exclusion of the press and general public during the testimony of a minor victim in a sex-offense [sic] trial." *Id.* at 602, 102 S.Ct. at 2617. Massachusetts claimed, similar to the State's argument in the present case, that the law was designed to facilitate the reporting of sexual offenses involving minors and protect the minor complainant from "undue psychological harm at trial." *Id.* at 600, 102 S.Ct. at 2616. According to the Court, when a constitutional right is being adversely affected by legislation, e.g., the right of the public's access to jury trials under the First Amendment, then "it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 607, 102 S.Ct. at 2620. The Court agreed, as we do herein, that protecting a minor sexual assault victim from undue trauma is a compelling state interest. However, the Court identified the deficiency in the statute by stating:

> But as compelling as that interest is, it does not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest. A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of the minor victim. *Id.* 608, 102 S.Ct. at 2620–21.

*Allen v. State*, 700 S.W.2d 924 (Tex.Cr. App.1985) was concerned with whether the rape shield laws (§ 22.065, Penal Code), and their necessary limitation on cross-examination violated a defendant's right of confrontation. In an opinion by Presiding Judge Onion the Court rejected the defendant's appeal by pertinently stating:

> Thus a statute that purports to prohibit completely the introduction of the victim's consensual sexual activity with persons other than the defendant is unconstitutional unless given a judicial gloss requiring a hearing out of the jury's presence so that the defendant, upon motion, may be given an opportunity to demonstrate that due process requires the admission of such evidence because probative value in the context of *that particular case* [emphasis added] outweighs its prejudicial effect on the prosecutrix. *Id.* at 932.

What makes these cases instructive to the present issue is the recognition by the Courts that each case had to be judged on its own merits, otherwise the statute would be unconstitutional.

This is the constitutional deficiency that plagues Art. 38.071, *supra*. It is simply too broad in its reach to support the infringement that it endorses and if a reasonable alternative and lesser intrusive procedure is available that would satisfactorily accomplish the legislative purpose then the offending statute must be viewed in that light. *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

The necessity of approaching each case cautiously and considering the effect of testifying on the victim in each case rather than all cases as a class is readily apparent in this case. Although the videotaped interview of M___ P___ was played to the jury the *State* elected to call the child to testify in open court, in the presence of the accused. Three things immediately come to mind when reviewing the State's action. One, the prosecutors had no concern for the victim and were merely interested in effectively prosecuting the appellant. Two, the prosecutors were convinced that the child would suffer no undue trauma from her testimony and she could testify effectively. Or, three, it is possible that they wanted to ensure the appellant had the opportunity to question the witness. Irrespective of the concern, or possibly lack thereof, the purpose of the statute was not achieved except to the extent of admitting the videotape.

■ Even when the effect of confrontation on a child can be accurately predicted to the extent the child could be classed as unavailable,[15] it is still necessary that the recorded testimony carry the necessary indicia of reliability. And, this can only be achieved by giving the accused the opportunity for cross-examination.[16] Irrespective of the age of a victim, without at least the opportunity for cross-examination the reliability of the truth finding process must be questioned. *Ohio v. Roberts, supra.*

The State also predicates its support of Art. 38.071, *supra* upon the United States Supreme Court decision in *California v. Green, supra*. In *Green* the Supreme Court basically considered the application of the Confrontation Clause of the Sixth Amendment to the admissibility of prior inconsistent statements proffered as substantive evidence under a section of the California Evidence Code. Green, the defendant, was convicted of supplying marihuana to a minor. At a preliminary hearing the minor identified the defendant as his supplier. At trial, however, the child witness was particularly evasive, claiming he could not remember who gave him the marihuana because he was under the influence of drugs at the time.

Over the defendant's objection, the trial court admitted the witness' prior inconsistent statements. The California Supreme Court reversed the defendant's conviction because admitting the prior inconsistent

---

**15.** See: *Jernigan v. State*, 589 S.W.2d 681 (1979); Art. 39.12, V.A.C.C.P.

**16.** Whether such opportunity for cross-examination requires physical presence of both the child victim and the accused or just the attorney representing the accused is not the issue in this case; therefore, we express no opinion in this regard.

statement violated the defendant's right of confrontation. The United States Supreme Court, however, affirmed the conviction finding no Sixth Amendment violations in the admissibility of the prior inconsistent statement.

The State claims that the issue in this case and that in *Green* are principally the same. They summarize the question as: "given the subsequent opportunity to confront the witness [as authorized by Art. 38.071, § 2(b)], whether any confrontation problem exists at all. In other words, the State claims that the opportunity of the defendant to call the child to testify nullifies the question of confrontation.

The vital and significant difference between the facts of *Green* and the content of Art. 38.071, § 2, *supra,* is: the defendant in *Green* had the opportunity to cross-examine the minor witness at the preliminary hearing or contemporaneous with his statement. The Court observed:

> We also think that Porter's preliminary hearing testimony was admissible as far as the constitution is concerned wholly apart from the question of whether respondent had an effective opportunity for confrontation at the subsequent trial. For Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings.
>
> .   .   .   .   .
>
> ... In the present case respondent's counsel does not appear to have been significantly limited in any way in the scope or nature of his cross-examination of the witness Porter at the preliminary hearing. If Porter had died or was otherwise unavailable, the Confrontation Clause would not have been violated by admitting his testimony given at the preliminary hearing—the right of cross-examination then afforded provides substantial compliance with the purposes behind the confrontation requirement, as long as the declarant's inability to give live testimony is in no way the fault of the State.
>
> ... As in the case where the witness is physically unproducible, the State here has made every effort to introduce its evidence through the live testimony of the witness; it produced Porter at trial, swore him as a witness, and tendered him for cross-examination. Whether Porter then testified in a manner consistent or inconsistent with his preliminary hearing testimony, claimed a loss of memory, claimed his privilege against compulsory self-incrimination or simply refused to answer, nothing in the Confrontation Clause prohibited the State from also relying on his prior testimony to prove its case against Green.

What was present in *Green* (opportunity for cross-examination when statement was made) and absent in Art. 38.071, § 2, *supra* is their most significant contrasting feature. Under Art. 38.071, *supra* the ex parte statement (albeit it is videotaped) is expressly taken without the defendant being present or represented. Whereas, in *Green* the opportunity for contemporaneous cross-examination was extant and occurred.

### VII.

█ Art. 38.071 § 2, *supra* is also violative of the due process clause of the Fourteenth Amendment and the due course of law provisions in Art. I, § 19 of the Texas Constitution.[17] Historically, the due course of law clause in Art. I § 19 of the Texas Constitution has been equated and deemed synonymous with the guarantee of due process under the Fourteenth Amendment. *Mabee v. McDonald,* 107 Tex. 139, 175 S.W. 676 (1915). As recent as 1982, however, the United States Supreme Court commented that Art. I, § 19, *supra,* "is differ-

---

**17.** Due course of law will be referred to hereafter as due process.

ent from, and arguably significantly broader than ...," *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982), the comparable Fourteenth Amendment. Such an expansive distinction is not necessary to this opinion. What is necessary and what one must keep in mind is that the rights guaranteed to be protected from deprivation are identical: life, liberty, and property.

Due process does not lend itself to simple, concise definitions. In its most basic sense due process is the impediment that is constitutionally imposed on governmental conduct that offends our fundamental rights. Relative to the protection of one's liberty: "[t]he essential guarantee of the due process clauses is that the government may not imprison or otherwise physically restrain a person except in accordance with fair procedures." Rotunda, et al., *Treatise on Constitutional Law: Substance and Procedure* (West Publishing Co.: St. Paul, Minn., 1986), § 17.4, p. 213. In other words, due process is in itself essentially the same as fairness. Or, at the very least, due process is the vehicle used to arrive at fairness thereby protecting our fundamental rights. Accordingly, "a fair trial in a fair tribunal is a basic requirement of due process." *In Re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1965) at 136. If legislation alters the essential fairness of a trial then a due process violation is necessarily implicated. In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1975) it was specifically stated that "[t]he right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Id.* at 1692. Then, after emphasizing the superior role the presumption of innocence plays in our criminal justice system, the court continued:

> To implement the presumption [of innocence], courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. *Id.* at 1693.

The opinion continues with guidelines for determining whether a particular procedure diminishes fairness and is thus violative of due process. The court commented:

> But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close scrutiny ... [citations omitted] Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience. *Id.*

Consequently, in a criminal prosecution, when viewing legislatively authorized procedures that could be detrimental to one's fundamental rights, i.e., "a fair trial in a fair tribunal ...," *In Re Murchison, supra*, the legislation must be closely scrutinized. *Estelle v. Williams, supra*. Such an examination must be "based on reason, principle, and common human experience." *Id.*

Scrutinizing Art. 38.071, § 2, *supra*, and applying the predicates of consideration as suggested in *Estelle v. Williams, Id.*, it is evident that on its face Art. 38.071, § 2 imposes upon the defendant a constitutionally unacceptable burden. The courts of this state and country have never had to confront and review a trial procedure that requires the defendant to call as a witness his accuser if he wants to question the witness. Doing so places the defendant in the proverbial Catch-22: call the complainant and be able to question the witness; or alternatively, decline to do so and thereby waive the opportunity to cross-examine the witness. Either way the defendant is placed at a distinct and undue disadvantage. Conversely, the prosecution is placed in the unique and substantially advantageous position of being able to in essence present its evidence, then wait for the defendant to call the complainant, thereby allowing the State to repeat the videotaped statement. Or, by not calling the witness fail to controvert the videotape statement. It must be continually remembered that despite the morally and socially reprehensible nature of this type of offense the defendant must still be presumed to be innocent. "[R]eason, principle, and com-

mon human experience," *Id.,* dictate that a jury will respond negatively to a defendant compelling a child witness to testify after they have already seen the videotape of the child's allegations. The possible, if not probable, reaction of the jury to a trial incident of this nature would be unduly prejudicial to the defendant.[18] Prejudice, to this extent, will create a risk that the entire proceedings were fundamentally unfair. A risk of this nature does not comport with the concept of due process.

In *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) the Supreme Court was concerned with both due process and confrontation violations by an infringement upon the right of confrontation when a non-testifying co-defendant's confession was admitted into evidence and considered as substantive evidence of the defendant's guilt. Noting initially the historical unanimity of the court in its commitment to the defendant's right of confrontation and cross-examination, the Court recognized the overlapping due process issue when it observed that the right of confrontation and cross-examination " 'is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' " *Id.,* 476 U.S. at 540, 106 S.Ct. at 2062.

The Court continues and pertinently states:

> On one level, the right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. To foster such a system, the Constitution provides certain safeguards to promote to the greatest possible degree society's interest in having the accused and the accuser engage in an open and even contest in a public trial. The Confrontation Clause advances these goals by ensuring that convictions will not be based on the charges of unseen and unknown—and hence unchallengeable—individuals. *Id.,* 476 U.S. at 540, 106 S.Ct. at 2062.

Under Art. 38.071 § 2, *supra* the essential state's witness, the complainant, will be what due process and the confrontation clause endeavor to prevent: "unseen" and "unchallengeable" witnesses. *Id.* Unless, of course the defendant takes the step of calling to testify the essential prosecution witnesses to testify. Nowhere and at no time in Anglo-American jurisprudence has an accused ever been required to call as a witness the accuser in order to enjoy the fundamental right of cross-examination. That is, until Art. 38.071 § 2, *supra.* It is an illogical as well as unconstitutional scheme to place a defendant, who, again, must be presumed innocent, in the untenable position of either requiring the child to testify and thereby run the very real risk of incurring the wrath of the jury or forgo the right to invoke " 'the greatest legal engine ever invented for the discovery of truth,' " *California v. Green, supra,*—cross-examination.

■ It must also be noted that the public's response to the unfortunate victims of sexual child abuse has been and continues to be great.[19] The protective attitude of the legislatures and the courts to child victims is indicative of a public policy that understandably leans quite heavily in favor of the child victims.[20] So long as the empathy for the plight of the child victim remains within the confines of constitutionally protected rights then the attitude and resulting actions are both laudable and appropriate. It is patently unfair, however, in both a practical and due process sense, to require a defendant to offend public policy and compel a child victim to testify in open court, or, as before, effectively, abandon cross-examination. It is a violation of due process to statutorily impose upon an accused person the necessity of

18. See: Graham, "Indicia of Reliability and Face to Face Confrontation: Emerging Issues in Child Sexual Abuse Prosecutions," 40 *U.Miami L.Rev.* 19 (1986).

19. See: fn. 13.

20. See: Buckley, "Introduction: Background and Review of Child Sexual Abuse: Law Reforms in the Mid–1980's," 40 *U.Miami L.Rev.* 5 (1985); Note, "The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations," 98 *Harv.L.Rev.* 806 (1985).

electing between violating public policy interests and demanding a constitutional right. To do otherwise would constitute a noticeable intrusion upon our concept " 'of a fair trial which is this country's goal,' " *Lee v. Illinois, supra,* and would generate doubt as to the " 'ultimate integrity of the fact finding process.' " *Ohio v. Roberts, supra.*

Authorizing a trial procedure that seemingly in itself defeats the purpose of the statute, Art. 38.071 § 2, *supra* does authorize the State to call the child to testify, which, as previously noted, was what occurred in the present case. This and the defendant's cross-examination, according to the State, satisfies the problem because the defendant did get face-to-face confrontation. Such contention is persuasive until one takes notice of the collateral procedural consequences of such action.

■ As stated, in the present case, the State called the complainant to testify as a rebuttal witness. However, her testimony was simply repetitious of her videotape statement and, as the appellant's attorney observed in his objection, not actually rebuttal.[21] And, as such it was unquestionably bolstering of an unimpeached witness. *Pless v. State,* 576 S.W.2d 83 (Tex.Cr.App. 1978); *Cf. Hulin v. State,* 438 S.W.2d 551 (Tex.Cr.App.1969). So, before the appellant was able to cross-examine the child the State introduced into evidence the ex parte, recorded, sterile, unencumbered testimony of the complainant (videotape) and later live testimony that was simply a reiteration of the incidents that were detailed in the videotape session. Due process does not authorize legislative bodies to alter accepted trial procedures to the extent that the prosecution can enjoy such a benefit at the expense of the defendant. It is just, quite simply, unfair. The procedure that permits the prosecution to in essence introduce their case-in-chief twice, and thereby bolster their version of the facts unconstitutionally alters the system to the extent that both "the perception as well as the reality of fairness ...," *Id.* are exchanged for the advantage integral to the duplication of evidence. Due process will not condone such a monumental abuse.

This opinion is contrary to the decisions courts in other states have reached under remotely similar circumstances. That, however, is what is significant: the circumstances were just similar and not identical. The Arkansas videotape statute and the Arkansas Supreme Court's decision regarding that statute are instructively supportive of our opinion. According to Ark.Stat. Ann. § 43–2036 (Supp.1985), in summary, a videotape deposition of a child under the age of seventeen years may be ordered by the trial court in response to a motion by the state, provided "good cause ...," *Id.,* is shown and opposing counsel is notified. Further, the deposition is to be taken "before the judge in chambers in the presence of the prosecuting attorney, the defendant and his attorneys." *Id.*

Noting, among other things, that their statute "requires face-to-face confrontation between the victim, the defendant and his attorney at the time the deposition is taken, and provides the opportunity for cross-examination of the victim by the defendant," *McGuire v. State,* 706 S.W.2d 360 (Ark. 1986), the Arkansas Supreme Court understandably declared that state's videotape statute constitutional.

The Supreme Court of South Carolina also ruled that their videotape statute was constitutional. However, the South Carolina statute they reviewed, S.C.Code Ann. § 16–3–1530(6) (1985), was restricted to specific cases and special witnesses, i.e., children, the elderly and handicapped people. It requires a motion and court order. Further, the defendant must be present at the deposition, but out of the victim's vi-

---

**21.** In this state rebuttal testimony does not necessarily have to be directed against newly elicited evidence. *Lackey v. State,* 638 S.W.2d 439 (Tex.Cr.App.1982). Allowing *new* evidence to be introduced as rebuttal (after the opposing party has rested in its presentation of evidence) is discretionary with the court and is permissible consistent with the administration of justice. *Id.* Whether the same can be said for purely repetitive evidence is doubtful. But, the admissibility of purely repetitive evidence is not fundamental error. *Douthit v. State,* 482 S.W. 2d 155 (Tex.Cr.App.1972).

sion, and cross-examination is permitted by the defendant's attorney contemporaneous with the statement. *State v. Cooper*, 353 S.E.2d 451 (S.C.1987).

In *State v. Sheppard*, 197 N.J.Super. 411, 484 A.2d 1330 (1984), the court granted the State's motion for permission to videotape a child witness' testimony prior to the trial. In their excellent opinion the Superior Court reviewed cases from other states and emphasized that the means they were authorizing required that "the defendant as well as the judge, the jury, and the [trial] spectators, will see and hear her [the child] clearly." *Id.* at 1343. And, most significantly, "[a]dequate opportunity for cross-examination will be provided." *Id.*

Similar court decisions are found in *State v. Vigil*, 103 N.M. 583, 711 P.2d 28 (1985); *People v. Johnson*, 146 Ill.App.3d 640, 100 Ill.Dec. 330, 497 N.E.2d 308 (Ill.App. 5 Dist. 1986); *State v. Melendez*, 135 Ariz. 390, 661 P.2d 654 (1982).

We have discovered no case from any jurisdiction that is exactly in point. The statutes most comparable to Art. 38.071 § 2, *supra* are those in Louisiana and Kentucky. Because of procedural defects Louisiana courts have yet to confront the confrontation issue directly, see: *State v. Guidroz*, 498 So.2d 108 (La.Ct.App. 5th Cir. 1986); *State v. Interest of R.C., Jr.*, 494 So.2d 1350 (La.Ct.App. 2nd Cir.1986).

Very recently, the Kentucky Supreme Court, however, declared their identical statute unconstitutional. The basis for their decision was not that it violated confrontation—that was not discussed. K.R.S. 421.350 was declared unconstitutional because it permitted the testimony of a child witness who had not been declared competent by the trial judge and did not require that the child take the oath. This, according to the court, constituted a violation of

the separation of powers doctrine in that it legislatively usurped the trial court's responsibility in determining the competency of witness. *Gaines v. Kentucky*, 728 S.W. 2d 525 (Ky.Sup.Ct.1987).

### VII.

Based on our previous observations and authorities and for the reasons stated, we find that Art. 38.071, § 2, *supra* is both facially and as it was applied to the appellant an unconstitutional deprivation of his right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution.

In addition, and independent of the above finding, we further find that Art. 38.071, § 2, *supra* is both facially and as it was applied to this appellant an unconstitutional deprivation of his state guaranteed right of confrontation under Art. I, § 10 of the Texas Constitution.[22]

We further find that Art. 38.071, § 2, *supra* is violative of the due process clause of the Fourteenth Amendment. In addition, and independent of our finding that the federal due process guarantee is offended by Art. 38.071, § 2, *supra* we find that Art. 38.071, § 2, *supra* violates the due course of law guarantee of Art. I, § 19 of the Texas Constitution (1876).[23]

The legislative activity that produced Art. 38.071, *supra*, was, as we have recognized, well intended. However, when the legislature imposes barriers on an accused's constitutional rights it should do so narrowly and only with great caution and concern. In the instance of child protection statutes the effort is essentially aimed at reconciling opposites: the innocence of youth stained by experience of age. Although it is not an impossible task it is one that is made difficult by the concerns we must by necessity have for the rights of people accused of crimes, no matter how

**22.** Our decision that Art. 38.071, § 2, *supra*, is unconstitutional under both Art. I, § 10 and Art. I, § 19 of the Texas Constitution (1876) is made after a thorough analysis of the statute, the applicable constitutional provisions, and available case law. It was also made independent of our analysis of the comparable constitutional provisions (Sixth and Fourteenth Amendments).

Further, any federal cases that were cited in our analysis of the state constitution were used only for the purpose of guidance, and do not themselves compel the result that the Court has reached.

**23.** See fn. 22.

vile and repulsive the alleged offense. This area of the law is dominated by emotion, which is understandable in light of the interests society wants to protect—abused children. But irrespective of the interests to be protected of greater concern should be the adherence to our constitutional rights. We cannot ever permit emotion-charged issues to erode our fundamental liberties. To do so would produce emotionally pragmatic deviations from established standards and that will inevitably and ultimately result in a complete erosion of those rights that make us a free society.

Accordingly, the Court of Appeals is affirmed and the cause remanded to the trial court.

TEAGUE, Judge, concurring.

Contrary to what many commentators, trial and appellate court judges and justices, legal scholars, law school professors, prosecutors, defense attorneys, defendants, victims, special interest groups, etc., might believe, the issue that is before this Court to resolve is, in principle at least, not one of first impression. I believe that Judge Duncan, the author of the majority opinion, has attempted to point this out in his gargantuan effort for the Court. However, as seen by Judge McCormick's dissenting opinion, he has probably failed in his herculean effort. The truth of the matter is that the emperor, in urging this Court to adopt what Judge McCormick suggests comes to us wearing only a different form of garb.

To appreciate Judge Duncan's majority opinion for the Court, I believe that one must focus his attention on the State's case in chief. Reader: Forget what happened beyond this point.

Judge Duncan points out on pages 304 and 305 of his majority opinion for the Court the trial procedure that was followed in this cause. As reflected thereon, when the State presented its case in chief against appellant, the complaining witness, although then available and willing to testify against appellant, was not called by the prosecutor to testify against him. Rather than call the available and willing complaining witness to testify against appellant during his case in chief, the prosecutor, over objection, but pursuant to the provisions of Art. 38.071, V.A.C.C.P., chose to substitute in her stead the record of the pretrial videotape interview that had been conducted by the assistant director of the Dallas Rape Crisis Center of the complainant, who was not an officer of the court. Neither the appellant nor his attorney were present when the interview took place. Indeed, by the applicable provisions of Art. 38.071, supra, they could not then be present. Thus, appellant was not given the opportunity to cross-examine the complainant during the pretrial interview session, nor was he given the opportunity to cross-examine the complainant during the State's case in chief. Unquestionably, had the record of the pretrial videotape interview been excluded from evidence during the State's case in chief, and had the prosecutor not called the complaining witness to testify during that time, it is clear from this record that after the State rested its case appellant would have moved for and the learned trial judge would have granted his motion for an instructed verdict of not guilty. If this had occurred, the issue that Judge McCormick poses would then perhaps be present for this Court to resolve.

Thus, what may have occurred after the State rested its case in chief is irrelevant and immaterial to the issue that is before us to decide, which is rather simple, namely, was appellant denied his right to confront his accuser and cross-examine her when the State presented its case in chief, or, to put it another way, was the State entitled to substitute in the place of the complaining witness the pretrial videotape interview of her, when appellant was never given the opportunity pretrial to cross-examine her. Given the historical right of confrontation and cross-examination, and court decisions, the answers to these questions should be obvious even to a normally intelligent ten year old child.

The only real question that must be answered in this cause is the following: Whether the State, in presenting its case in

chief against appellant, was entitled to substitute the above ex parte hearsay pretrial videotape interview of the complaining witness in the place of the complaining witness' physical presence, when she was then available and willing to testify for the State but was not called to testify at that time, and neither appellant nor his attorney had been given the opportunity to cross-examine the complainant when the pretrial interview took place?

I find that the answer to the posed question is controlled by the principles of law announced in *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Judge McCormick's suggestion that the Supreme Court recently held in *Kentucky v. Stincer*, —— U.S. ——, 107 S.Ct. 2658, 96 L.Ed. 2d 631 (1987), to the contrary is sorely misleading.

In *Kentucky v. Stincer*, supra, an aggressive and assertive majority of the Supreme Court merely held that the exclusion of the defendant, but not his counsel, from a hearing held to determine the competency of two child witnesses was not violative of the defendant's federal right of confrontation. However, the two witnesses testified during the prosecution's case in chief and the defendant not only had the opportunity but did fully and completely cross-examine the witnesses at that time. Of course, whether the above majority of the Supreme Court will in the future hold that a defendant may be excluded from the courtroom while his trial is being conducted, and he is not guilty of such misconduct that warrants his removal, remains to be seen.

I will first address this Court's decision of *Pointer v. State*, 375 S.W.2d 293 (Tex. Cr.App.1964), which was decided when this Court was looked upon much like many of us look upon the Supreme Court of the United States today—with pity.

In *Pointer v. State*, supra, an examining trial was held in that cause. The opinion reflects that the defendant was not represented by counsel at the examining trial. The opinion by the Supreme Court reflects that although the defendant did not personally cross-examine the complaining witness he apparently tried to cross-examine some of the other State's witnesses. The case was bound over to the Grand Jury and the defendant was later indicted for robbing the complainant. In presenting its case in chief against the defendant, the State did not seek to have the complainant, who had moved from Texas to California after the offense had occurred, testify but, instead, relied upon the witness' examining trial testimony. Art. 750 of the 1925 Code of Criminal Procedure, which then controlled, see now Art. 39.12, V.A.C.C.P., provided: "The deposition of a witness taken before an examining court or a jury of inquest, and reduced to writing, and certified according to law, in cases where the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, may be read in evidence as is provided in [Art. 749, C.C.P., which provided in part that same was admissible if the witness had removed himself beyond the limits of the State] for the reading in evidence of depositions." The defendant was convicted. This Court affirmed. In affirming the conviction, this Court held that the proper predicate had been established for the admissibility of the "deposition", as all of the prerequisites had been met. Through the testimony of the complainant's sister, the State established that the witness not only had permanently moved to California, he was at the time of trial physically present in California and thus unavailable to testify at trial. The State apparently made no effort to obtain the witness' physical presence for the trial, opting instead to rely entirely upon the above statute. This Court rejected the defendant's contention that because he was not represented by counsel at the examining trial, the "deposition" was inadmissible evidence. In rejecting this contention, the Court simply held that a defendant was not entitled to the appointment of counsel at an examining trial and further held that an examining trial was not a critical stage of the proceeding. Interestingly, there is

not a single word in the unanimous opinion by this Court about the right of the defendant to confront or cross-examine the complaining witness during the examining trial.

The Supreme Court of the United States, in *Pointer v. Texas,* supra, granted certiorari in order to decide whether the Fourteenth Amendment's guarantee of a defendant's right "to be confronted with the witness against him" was applicable to the States by virtue of the Fourteenth Amendment, and answered the question in the affirmative. Previously, the Supreme Court had ruled that for purposes of the Sixth Amendment that right was guaranteed to federal defendants. The Supreme Court also held that under the circumstances of the case, the use of the complaining witness' examining trial transcript to convict the defendant denied him rights guaranteed by the Sixth and Fourteenth Amendments to the Federal Constitution: "We hold today that the Sixth Amendment's right of an accused to confront the witnesses against him is like [the right to counsel, which is] a fundamental right and is made obligatory on the States by the Fourteenth Amendment[,] ... and the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him ... and to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law ..." 380 U.S. at 403, 85 S.Ct. at 1068. In passing, the Supreme Court observed: "The case before us would be quite a different one had [the complainant's] statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine [the witness]." 380 U.S. at 407, 85 S.Ct. 1069–1070. In a relatively short period of time, a little over 5 years later, the Supreme Court was presented with just such a case.

In *California v. Green,* 399 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), in the presentation of its case in chief, due to the fact that the State's "star" witness had become "markedly evasive and uncooperative on the stand", the prosecution was permitted to rely upon the transcript from the preliminary hearing that had been held in that cause, as substantive evidence during its case in chief to establish the defendant's guilt. The transcript was admissible pursuant to a California statute which provided that "evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with § 770", which merely required that the witness be given an opportunity to explain or deny the prior statement at some point during the trial. At the preliminary hearing, the defendant was represented by counsel and the witness was subject to full and complete cross-examination by counsel. The California Supreme Court reversed the conviction, holding that § 770 was unconstitutional insofar as it permitted the substantive use of prior inconsistent statements of a witness to convict the defendant, even though the statements were subject to cross-examination at the prior hearing. The Supreme Court of the United States reversed.

In reversing the California Supreme Court's decision, the Supreme Court held that the issue before it was whether a defendant's constitutional right "to be confronted with the witnesses against him" is necessarily inconsistent with a State's decision to change its hearsay rules of evidence to permit the substantive use of prior inconsistent statements to convict the defendant on the theory that the usual dangers of hearsay are largely nonexistent where the witness testifies at trial, and answered the question in the negative. In so holding, the Supreme Court pointed out that "there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness *and* subject to full and effective cross-examination." (My emphasis.) 399 U.S. at 159, 90 S.Ct. at 1935.

Thus, the Supreme Court merely held in *Green,* supra, that the California statute, § 770, supra, was not unconstitutional on its face. It also held that the Confronta-

tion Clause of the Sixth Amendment to the Federal Constitution did not preclude the introduction of the witness' out-of-court declaration, which came from the preliminary hearing, which had been taken under oath at which the witness had been subjected to full and complete cross-examination, to prove the truth of the matters asserted therein. The Supreme Court *in passim* referred to the fact that the declarant was not only available as a witness at the defendant's trial, he was actually called to testify and did testify for the prosecution in its case in chief, even though when testifying he was "markedly evasive and uncooperative on the stand." The prosecutor used the transcript from the preliminary hearing to "refresh" the witness' memory, and apparently not for impeachment purposes. Thus, there was no inability or unavailability of the witness exception present in that case.

The State in this cause, in urging that under the circumstances of this case, the applicable provisions of Article 38.071, supra, are facially constitutionally valid, has obviously chosen to selectively pluck certain language out of context from *California v. Green*, supra, to support its position. The State would do well to read and re-read what Justice Harlan stated in the initial paragraph of the concurring opinion that he filed in that case, in order that it might understand what the Supreme Court actually decided in *Green*, supra: "The precise holding of the Court today is that the Confrontation Clause of the Sixth Amendment does not preclude the introduction of an out-of-court declaration, *taken under oath and subject to cross-examination*, to prove the truth of the matters asserted therein, when the declarant is available as a witness at trial." 399 U.S. at 172, 90 S.Ct. at 1942. (My emphasis.)

The case at Bar does not encompass or implicate the situation where the accused and his counsel were given the opportunity to be present and cross-examine the complaining witness pretrial, which occurred in *California v. Green*, supra. The issue here concerns whether the applicable provisions of Art. 38.071, supra, should be upheld in order to permit the State to intro-

duce into evidence during its case in chief an ex parte out-of-court hearsay statement of a witness, that was recorded pretrial on a videotape, at which appellant was not given the opportunity to be present and cross-examine the witness, and the witness was available and willing to testify against the defendant during the State's case in chief.

I find that too much attention is focused upon the fact that the complaining witness testified as a rebuttal witness at trial, and too little attention is given to what was admitted into evidence during the State's case in chief. See Judge McCormick's dissenting opinion.

It is now axiomatic that proof beyond a reasonable doubt is among the essentials of due process and due course of law. "The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation ... [and] unless there remains any doubt about the constitutional stature of the reasonable-doubt standard, we [the Supreme Court] explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 362, 366, 90 S.Ct. 1068, 1071, 1073, 25 L.Ed.2d 368 (1970). Thus, it should be clear to all that the prosecution in this instance had the burden of proof to establish, if it could during its case in chief, all of the essential elements of the charging instrument beyond a reasonable doubt.

In this instance, in order to prove the guilt of appellant, the State during its case in chief introduced into evidence over objection the ex parte hearsay out-of-court videotape interview that had occurred between the complaining witness and another lay person. During the State's case in chief, although available and willing to testify against appellant, the complainant was not called to testify against appellant.

May the Legislature enact legislation or may this Court enact a rule of evidence that actually eliminates a complaining wit-

ness from physically testifying during the State's case in chief, when that witness is available and willing to testify, and substitute in her place an out-of-court ex parte hearsay television production made on magnetic tape of the witness and another person at which the defendant is not given the opportunity to be present and cross-examine the witness? Only if one chooses to adopt the way that criminal trials are conducted in some parts of this world can the question be answered in the affirmative.

The only conceivably valid argument I find that can be made to support the enactment of Art. 38.071, supra, also see Tex. Crim.R.Evid., Rule 801(e)(1)(D), and in turn the admissibility of the out-of-court hearsay video tape interview, an ex parte video tape deposition if you please, as substantive evidence in the State's case in chief is where "exceptional circumstances" exist and in the interest of justice it is necessary to take and preserve testimony away from the courtroom without the presence of either the accused and his attorney. In this instance, however, the State has not presented any "exceptional circumstances" that might have authorized the admission into evidence of the video tape under the above rule of law.

I find that not even the Federal Rules of Evidence would permit the introduction into evidence during the Government's case in chief of the videotape recording that was admitted into evidence, over objection, at appellant's trial. See 18 U.S.C. § 3503(a), which permits the admission into evidence during the Government's case in chief of video taped depositions, provided that "exceptional circumstances" exist. Also see and compare Rule 804(b), Texas Rules of Criminal Evidence. Under the federal statute, however, before such an out-of-court videotaped recorded statement is admissible, the deponent must be placed under oath and subject to rigorous cross-examination on all issues. The accused has the right to be present during the deposition and has the right to be represented by counsel. The scope of the examination is as would be allowed at full trial, i.e., the deponent may be subject to rigorous cross-examination on all issues. The entire procedure is under the authority and general supervision of the trial court.

Article 38.071, supra, as applicable here, expressly provides, however, that neither the accused nor his attorney have the right to be present when the recording of the oral statement of the child-witness is made, and thus has no right to cross-examine the child witness at that time. Nor must the child be sworn before the interview. Thus, the child-witness need not even fear potential punishment for lying. Under the applicable provisions of the statute, the trial court may not even be implicated in the tape recorded interview session. The trial court certainly was not implicated in this cause when the videotape recording was made. The person interviewing the child-witness may not even be an officer of the court, and may not even be qualified to conduct such an interview of a potential child witness. In this instance, I do not find that the person who conducted the interview with the child witness, who at that time was not an officer of the trial court, was qualified to conduct such an interview with a child witness. In short, the Texas statute mandates no practical concern for the accuracy of the truth-determining process by assuring that the trier of fact will have a satisfactory basis for evaluating the truth of the prior statement consistent with both accurate truth determination and practical considerations for the administration of justice. Furthermore, it is difficult for me to understand how, in an ex parte surrounding, such statement can ever be a fair substitute for live testimony on the witness stand. In short, the kind of "ex parte deposition" taken here was sorely lacking in the ambiance of solemnity closely approximating a trial. See *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970); Cf. *California v. Green*, supra. Also see Binder, *Hearsay Handbook: Second Edition* (1983).

Judge McCormick opines in the dissenting opinion that he filed in this cause: "[I]t is apparent [to me] that no future statute will be allowed to survive absent a procedure which follows contemporaneous cross-

examination to be made at the time the child is interviewed on tape." Of course Judge McCormick is premature in his thought because this Court cannot, and must not, write advisory opinions.

It is obvious to me that what Judge McCormick overlooks in his dissenting opinion is the fact that the choice that appellant was given in this cause is constitutionally indefensible. See and compare *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (Held, defendant's testimony in support of motion to suppress evidence under the Fourth Amendment may not, under the Fifth Amendment, be admitted over objection at trial as evidence of defendant's guilt.) Furthermore, as I have attempted to point out, the issue of choice is secondary to the real issue that is before this Court to decide, which is whether the State may use an ex parte out-of-court hearsay statement of an available and willing to testify witness during its case in chief to establish the defendant's guilt beyond a reasonable doubt, and the defendant was never given the opportunity to cross-examine the witness when the statement was taken. The essential rudiments of due process and due course of law forbid the admission of such a statement, and Judge Duncan's majority opinion correctly so holds, which holding is extremely limited in my view, which is contrary to what Judge McCormick and others might believe. Those persons simply see too many "bugey bears" when no "bugey bears" actually exist.

With these few comments, I wholeheartedly join Judge Duncan's majority opinion for the Court.

CAMPBELL, Judge, concurring and dissenting.

While I agree with the majority's ultimate disposition of this case, I do not believe that appellant was denied cross-examination as guaranteed by the Federal and State Constitutions. Clearly, *in this fact situation,* appellant was afforded an opportunity to question the victim and did, in fact, question the victim. In the view of the position taken by the majority in Part VII, however, I concur in the judgment of the Court.

Art. 38.071, § 2, V.A.C.C.P., violates the Due Process and Due Course of Law clauses of the Federal and State Constitutions when examined facially. The failure of the statute to specify when and by whom the child will be called for further testimony forces the accused to take the initiative in calling as a defense witness, a person whose testimony is likely to be adverse to his defense, thereby creating a Hobson's choice. This forces the accused to, in effect, choose between his constitutional rights—the right to confrontation versus the right not to call witnesses or testify in his own behalf.

The Supreme Court has consistently emphasized that the confrontation clause is designed to permit the defendant to *cross-examine* the witnesses against him. To say that a defendant has a right to cross-examine witnesses implies that the State must endeavor to elicit its evidence in the form of direct testimony before resorting to out-of-court, videotaped statements, i.e., it should be the State's duty to examine them in the form of direct examination.

This broader notion of confrontation is not only consistent with Supreme Court caselaw but also serves an important procedural purpose mentioned previously.

Certainly, it is beyond question that the duty is upon the State to prove each element of the charged offense beyond a reasonable doubt, and it is beyond question that an accused enjoys the presumption of innocence. But Art. 38.071, supra, simply commands the presence of the victim, leaving to the accused the joyous opportunity of calling the victim to the stand, thereby thwarting the public policy behind the statute, and almost guaranteeing his [the accused's] own conviction in the process.

While critics may say that a right to remain passive is not a constitutional right at all, it seems to this writer that such a doctrine is firmly imbedded in the Fifth Amendment right that "no person shall be compelled in any criminal case to be a witness against himself . . ." U.S. Constitution, Amend. V and in the right of the

accused to "not be compelled to give evidence against himself, ..." Texas Const., Art. I, Sec. 10.

With these observations, I join the judgment of the Court.

McCORMICK, Judge, dissenting.

When the members of this Court promulgated and adopted the rules of evidence in December of 1985, to go into effect on September 1, 1986, we expressly included within the statements which are *not* hearsay in nature the videotape statement made by a child victim under Article 38.071, V.A.C.C.P. See Tex.R.Crim.Ev.Rule 801(e)(1)(D). Today, a majority of the Court decides that this same statute is unconstitutional both facially and in its application, without making any reference to or analyzing the statute in terms of Rule 801, supra.

The crux of the majority decision is that a criminal defendant's federal and state constitutional rights to confrontation and due process are impermissibly infringed by a statute too broad in scope which forces a defendant to choose between calling the child and inflaming the jury or waiving cross-examination. Today's opinion may be characterized as a dangling carrot held out to the Legislature, enticing them to attempt to fashion a more narrow procedure, affecting only certain types of cases, and not run afoul of our judicial stamp of disapproval. Given the broad brush wielded by the majority, however, it is apparent that no future statute will be allowed to survive absent a procedure which allows contemporaneous cross-examination to be made at the time the child is interviewed on tape.

I embrace the concept that the *opportunity* for cross-examination lies as a cornerstone of the right of confrontation and that it is the *opportunity* for confronting an adverse witness *at trial* that is the cornerstone issue. See *Pennsylvania v. Ritchie,* — U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), and cases cited therein. I cannot agree that Article 38.071, supra, interpreted along with the Court's own rules of evidence, violates either principles of confrontation or due process.

Confrontation in the most basic sense requires that witnesses be present at trial and that the defendant be permitted to have the opportunity to cross-examine them. See *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Mattox v. United States,* 156 U.S. 237, 5 S.Ct. 337, 39 L.Ed. 409 (1895); *Garcia v. State,* 210 S.W.2d 574 (Tex.Cr.App.1948). In other words, and as the majority notes, "by requiring an accuser's presence in court the opportunity of cross-examination is necessarily attained." Article 38.071, Section 2, supra, satisfies this requirement by providing that the child will be available to testify. The majority responds that availability is not enough; that the hearsay nature of the videotaped statement lacks crucial "indicia of reliability." See *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

At first blush it does appear that the Legislature intended to create a new hearsay exception, and if used *in lieu* of live testimony, such is admittedly the nature of the videotaped statement. The hearsay nature of these statements in such a setting does not render them inadmissible, however, for the simple reason that the declarant is available to testify at trial. Where the declarant is available for purposes of cross-examination, the Supreme Court of the United States has consistently found hearsay evidence admissible, reasoning that the opportunity to cross-examine the declarant about the content of the out of court statements sufficiently tests the reliability of those statements. See *Kentucky v. Stincer,* 631 U.S. ——, 107 S.Ct. 2658, 96 L.Ed.2d —— (1987); *Chambers v. Mississippi,* supra; *Nelson v. O'Neil,* supra; *California v. Green,* supra.

A much different situation exists in the instant case. The complaining witness testified, albeit after the videotape was played for the jury. Under Rule 801(e)(1), supra, the videotaped statement is not hearsay. That rule reads in pertinent part:

"Rule 801.

"(e) Statements which are not hearsay. A statement is not hearsay if:

"(1) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (D) taken and offered in accordance with Article 38.071 of the Texas Code of Criminal Procedure, ..."

Article 38.071, supra, standing alone, requires only that the child-victim be available to testify if her hearsay statement is admitted; our rules of evidence provide for admission of the child's prior taped statements as non-hearsay where the child actually does testify.

It would appear clear that in adopting Rule 801(e)(1)(D), supra, this Court has already seen fit to construe Article 38.071, supra, in a manner which recognizes the statute's facial validity while requiring that certain due process requirements be met before the statute in its application will also pass constitutional muster. Thus, in the instant case, the statement was admissible as non-hearsay because the declarant testified at trial, was subject to cross-examination by defense counsel regarding the statement, and the statement was taken and offered in accordance with Article 38.071, supra.

We, therefore, come full circle, back to the crucial issue of confrontation. The majority notes that Article 38.071, supra, requires the declarant to be made available, then remarks that the State's argument that the confrontation requirement is satisfied *vis a vis* this availability appears "persuasive until one notices the *collateral procedural consequences* of such action" (emphasis supplied), to wit: bolstering of the unimpeached videotaped statement by use of the child's live testimony.

Given the fact that appellant took the stand, denying the allegations and attempting to cast doubt on the child's credibility, I would not hold the rebuttal testimony improper. Too, the majority has not up to this moment addressed the fact that the videotaped interview was properly admissible, *as it was introduced at trial,* under the auspices of our own rules of evidence.

This Court has the obligation *not* to act as a super-legislature, substituting our opinion for that of the second branch of government. We have, instead, the responsibility to construe statutes in a constitutional manner where possible. *Ex parte Granviel,* 561 S.W.2d 503 (Tex.Cr.App. 1978); *Broyles v. State,* 552 S.W.2d 144 (Tex.Cr.App.1977). If the majority of this Court is concerned with fundamental due process concerns and with meeting its judicial responsibilities, the option of a savings construction of Article 38.071, supra, remains. It is a simple matter to require the State to call the child-declarant before playing the videotape, thus preserving what the majority views as the defendant's right to remain passive as well as any and all far-flung rights of confrontation. Absent a savings construction, the members of the Court today ignore both the power of the Legislature to change rules of evidence and our own prior interpretation of Article 38.-071 as shown by Rule 801(e)(1), both supra. See *Werner v. State,* 711 S.W.2d 639 (Tex. Cr.App.1986); *Gross v. State,* 165 Tex.Cr. R. 463, 308 S.W.2d 54 (1958). For these reasons, I respectfully dissent.

DAVIS and WHITE, JJ., join in this dissent.