IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN



 



ON REMAND


 




NO. 3-87-060-CR




ROBERT FLEMING,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE


 



FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT


NO. 6838, HONORABLE HAROLD R. TOWSLEE, JUDGE


 




PER CURIAM

 This is an appeal from a judgment of conviction for aggravated sexual assault. 
1983 Tex. Gen. Laws, ch. 977, § 3, at 5312 (Tex. Penal Code Ann. § 22.021, since amended). 
The punishment is imprisonment for fifty years.

 Appellant's first seven points of error complain of the admission in evidence of two
videotaped interviews with the complaining witness and of the overruling of appellant's objections
to hearsay testimony. In an unpublished opinion filed September 21, 1988, this Court found that
these points of error either were not preserved for review or presented harmless error. We
sustained appellant's points of error eight, nine, and ten, finding that the district court erred by
instructing the jury on the law of parole pursuant to 1985 Tex. Gen. Laws, ch. 576, § 1, at 4446
(Tex. Code Crim. Proc. Ann. art. 37.07, § 4, since amended). Rose v. State, 752 S.W.2d 529,
552 (Tex. Crim. App. 1988) (opinion on rehearing). Accordingly, we reversed the judgment of
conviction and remanded for a new trial as to punishment. On appellant's petition for
discretionary review, the Court of Criminal Appeals reversed this Court's judgment and remanded
the cause for reconsideration of points of error one through seven. Fleming v. State, No. 1245-88
(Tex. Crim. App., June 5, 1991) (not published).

Evidence


 The victim was four years old and a member of appellant's household at the time
of the offense. On May 20 and June 27, 1986, she was interviewed on videotape by Georgia
Compton, an investigator employed by the Bastrop County district attorney's office. Neither
appellant nor his attorney were present at the videotaping. At trial, the State introduced both
videotaped interviews in evidence over appellant's objection. 1983 Tex. Gen. Laws, ch. 599, § 1
at 3828 (Tex. Code Crim. Proc. Ann. art. 38.071, since amended).

 During the May 20 interview, the child related that appellant once placed his finger
in her vagina while her mother was away at work; that appellant's action was painful and
frightening, and caused her vagina to bleed; that appellant was unclothed at the time; and that he
asked her not to tell anyone about the occurrence. In the June 27 interview, the child related that
appellant undressed in front of her "a lot of times"; that on one occasion, while her mother was
at work, appellant put his finger in her vagina and anus; that this was painful; that she asked him
to stop but he did not; that he was unclothed at the time; that both of them touched his penis; and
that he threatened to spank her if she told anyone "what he did."

 In addition to the videotape, the State called eight "live" witnesses during its case-in-chief. The child herself testified, in relevant part, that appellant "touched" her and that she no
longer wanted to talk to him because he "hurt" her. Georgia Compton testified that she had
spoken with the child on several occasions after the videotaping and that the child had never
wavered in her description of the assault or the perpetrator. Compton testified further that she
had seen the child exhibit "a tremendous amount of fear" when in appellant's presence.

 The child's mother testified that she and the child lived with appellant in Elgin from
March 1985 to May 16, 1986. At first, the child was very fond of appellant and referred to him
as "daddy." In August or September 1985, however, there was a marked change in the child's
behavior:

Q. [W]hat types of behavioral change did you observe in the little girl?


A. Okay. She got to where she didn't want to talk in front of [appellant], and
she would cry. When he would be in the room she would shut up. She
begged me that she didn't want to live there anymore, and that she wanted
to live with her [grandmother].


Q. What else did you observe?


A. Constant complaining of her pee-pee hurting, or her butt hurting. She didn't
have no appetite. I could not get her to eat.


 . . . .


 She was obsessed with [appellant] not seeing her naked, which she hadn't
been, it didn't matter to her because she was just little. And when she was
in the bathroom she wanted to lock the door. She didn't want it open.


 She didn't have a kid attitude anymore; she didn't play with other kids. She
was their boss. She would tell them if they didn't do what she said that she
wasn't going to play with them.


 . . . .


 She masturbated in front of people. It was like she didn't realize people
were there. You could look at her but you could tell that she didn't even
know you were looking at her. And when I would ask her what she was
doing she would say "Oh, I was scratching my leg," or "I wasn't doing
nothing."


 . . . .


 And she got to where she was wetting the bed, which she had not done since
she was potty trained when she was about two and a half years old. She
would have a bad nightmare and I would wake her up and ask her what it
was, what was she saying, why was she screaming, and she would say
"[N]othing," and she just wanted to go back to sleep.


 . . . .


Q. [D]id she do anything or change in her behavior toward Robert Fleming, in
particular, besides these things you've talked about?


A. Just that she doesn't want to be alone with him. We have the third or fourth
apartment down from the end of the street, and she would chase me. She
would start chasing me and begging me to take her to work, or don't go to
work, or take me to [her grandmother's house].


 And he would walk out the door and she would stop and she would walk
back up there.


Q. Give the jury some idea of how long this behavior pattern persisted. You've
already said that it started in August -- late August or early September of
1985. About how long did this continue?


A. Well, even after I quit working she didn't go back to the way she was. She
calmed down a lot, but she didn't want to be left alone with him, and she
was still complaining about her pee-pee and her butt.


Q. Did you ever ask her "[W]hat in the world was wrong with you?" Did you
ever try to find out?


A. Yeah. And she would just say, "[N]othing." I would say "[H]as anyone
ever done anything to you that you didn't like?" And she said "[N]o."


Q. Now I want you to kind of flip the coin, if you will, and tell the jury what
changes, if any, you observed in the way Robert Fleming behaved toward the
little girl?


 . . . .


A. Before, he was real persistent that I not give in to her. She was a spoiled
kid. She was a very spoiled kid and would throw fits. And he was
persistent that I not give in to her when she would throw those fits, and then
I noticed that he started to give in. And he would say, "[W]ell, she's going
to end up getting her way anyway, so why fight about it."


 And he would go buy stuff that when she didn't even need it. He would go
out and buy her clothes; and she had a closet full of 'em. And toys, for no
reason, it wasn't her birthday and she didn't do anything spectacular. I don't
know, it was different.


 . . . .


Q. Over this period of time was Robert Fleming ever left alone with the little
girl?


A. On several occasions.


Q. Was there anybody else, any other male figures, that were left alone with the
little girl over an extended period of time?


A. Not to my knowledge.


Q. Okay. You have already testified that you tried to get some answers by
talking to the little girl and that she wouldn't open up to you. What action
did you finally take, later on, to find out what was wrong with her?


 . . . .


A. I asked [my sister, Carla] if she would talk to [the child] and find out if
anyone had ever done anything to her, and Carla said, "[Y]eah, I will."


Q. Before you go any further, just very, very briefly, give the jury a
background of where Carla Moses fits into the picture, and where she lives
at this time and what type of relationship she has with [the child].


A. Okay, she lived right next door. And her and [the child] have been real
close . . . .


Q. Okay, now, tell us exactly what date, if you can recall the date, that Carla
actually talked to [the child].


A. On May the 16th, [1986].


 . . . .


Q. Okay. And Carla had a conversation with her -- and how did you learn of
this conversation?


A. Ray Grady came up to my job and said you need to come home.


Q. And who was Ray Grady?


A. That was her boyfriend at the time and now it's her husband.


Q. Okay. And Ray Grady came and told you the conversation?


A. He didn't tell me the conversation, he just said that [the child] was telling
some pretty horrible things, and that I needed to get home.


Q. Okay, and what did you do?


A. I rode back to Elgin with him.


Q. Okay. And after you got back there did you have conversation, also, with
[the child]?


A. Yeah.


Q. Who all was in the room?


A. Carla was in there. She wasn't in there the whole time, I would say maybe
twenty minutes.


 . . . .


Q. Tell us exactly what the little girl told you.


A. Okay. I went in there where Carla and [the child] were and I said "[D]o you
have something you need to tell me?" She was acting very strange. She
would look at me and then look away and hold her head down and look up
at me; she tried to stay away from me.


 I said, "[W]hy don't you come sit over here with me?" And I said, you
know, "[W]hatever you've got to tell me I'm not going to be mad at you, I
promise, but if something happened you really need to tell me like you did
Carla."


 And Carla said "[Child], it's important that you tell your mom what you told
us." And so she started slowly saying what happened. She said Bob had
hurt her, and I said, "[H]ow did he hurt you?"


 . . . .


Q. Okay, be as specific as you can possibly be when you tell the jury what
happened. Go ahead and continue.


A. And I said, "[H]ow did he hurt you?" And she said, "[H]e stuck his finger
up my pee-pee."


Q. I'm sorry, I need to interrupt you again. Explain to the jury at this point
what her words are for her private parts.


A. Okay, her pee-pee is her vagina; and her tushie, she also calls her tush her
butt.


Q. I'm sorry to interrupt you, you may continue.


A. And I said, "[W]ell, did he touch it or what?" And she said, "[N]o, he
moved it in and out." And she showed me he was going like this
(demonstrating).


 And I said, "[W]ell, is that all he did?" And she wouldn't answer me.


 I said, "[W]hat was he doing with his other hand, was he holding your hand,
or was he pushing your hair back, or what was the other hand doing?" And
she said, "[I]t was on his wienie." And I said, "[W]ell, was he just touching
his wienie, holding it, or what was he doing?" And then she showed me he
was going like this (demonstrating in an up and down motion), masturbating.


Q. Is that all you can remember? If so, that's fine.


A. She didn't know what to say. I asked her, I said, "[W]ell, you know, why
didn't you tell me? Did he say he would hurt you if you started crying? 
And she said, "[W]ell he already hurt me." And I said "[W]hy didn't you
tell me?" And she said, "[W]ell, because he would hurt us. And kill you."


 . . . .


Q. Did she ever suggest at any time, since that date, that anybody else had done
this to her?


A. No. Well, at one time she was dreaming -- she was having a lot of bad
dreams, and we talked about it, and she said, "I know I must have dreamed
that." And I asked her, I said, "[D]o you think you probably could have
dreamed that Bob did all this to you?" She said, "[N]o, I didn't dream that
he did that."


Q. Okay. Can you describe [the child's] perception of Robert Fleming now, or
her attitude towards him?


A. She is scared to death of him.


Q. Is she scared to death of any other male that you know of?


A. No.



 The child's maternal grandmother also testified that the child's behavior changed
noticeably around September 1985:


Q. Well, just describe to the jury what you were able to observe in the way of
relationship to this young girl and [appellant], right at the very first?


A. Well, she liked him. In fact, she called him daddy.


Q. Would you describe it as being a warm and loving type of relationship?


A. Yes.


Q. Did it remain that way indefinitely?


A. No.


Q. When did you first observe things beginning to change?


A. I don't remember the date but it was when they moved to Hillside. That was
approximately September; somewhere along in there.


Q. September of what year?


A. In '85.


Q. Okay. I want you to describe now, for the jury, what you were able to
observe in the changes in [the child]. . . .


A. Well, first of all, it was when she would stay with me, come out to my house
and stay with me. She didn't want to go home. She didn't want to go home
at all. In fact she got to where [she] would ask me if she can live with me.


 [The child's mother] was working at Bob's dad's store, and I would watch
her during the day, and when I would go to take her home during the
evening, she would beg me not to take her home. She would get very upset,
and she would cry and just hold on to me.


Q. At the time, would she ever tell you why?


A. No. I asked her why. I said, "[W]hy don't you want to go home, mama will
be home about ten?" And she would say, "Let mama come get me."


Q. And who would be actually coming to pick her up, or would you take her
to --


A. I would take her to her house.


Q. Okay, and so who would be the only person in that house with her at that
time?


A. Bob.


 . . . .


Q. Did you notice any changes in the behavior of Robert Fleming during this
period of time?


A. I noticed that he didn't look at me when I went to their house.


Q. What about his relationship to the little girl? Did you notice anything, or
were you rarely there at the time?


A. The thing that I noticed more than anything was that he kept buying her
things. I mean lots of things, clothes, and he bought her flowers on
occasion. He just kept buying her things, and I kept asking [the child's
mother] why is he buying all these things. She said, "Well, I don't know,
I guess he wants to."


Q. And that was after I think you said September of 1985?


A. Yes, sir.


Q. Have you had any personal conversations with the little girl where you tried
to open her up to you and tell you exactly what was going on?


A. I had asked her to. That's after this came up. I had questioned her before
and she never said one word to me.


Q. But you could tell something was wrong?


A. I knew something was wrong.



 Carla Moses Grady, the child's maternal aunt, testified that she spoke with the child
on May 16, 1986:


Q. I want to turn your attention to May 16 when you had that conversation. 
And let me just ask you, tell me exactly, and tell the jury, what the child told
you.


A. Well, that night I had put the kids to bed and Ray Grady, my husband, was
talking to her and he told me he would like for me to come in and help talk
to her. So I went in there and I just sat down with her and started asking her
if anybody had ever hurt her. And she said her daddy did. She called Bob
Fleming her daddy.


 She said that he had hurt her, and I said, "[H]ow?" And she said he stuck
his finger up her pee-pee. I said did he stop, and she said, no, that he just
kept doing it until it started bleeding.


 And then, I had asked her if he done anything else, if he had made her touch
his wienie? And she said, no, that's all he done. And she said that was their
secret.


 . . . .


Q. Later on the night, did [the child's mother] come home?


A. Yea . . . Ray went up to where [the child's mother] was working because he
though Bob might have gone up there and cause some trouble or something.


Q. We have already had the testimony of [the child's mother], and she talked
about the conversation that she then had with the little girl. Were you
present during any of the conversation?


A. Just when -- uh -- she wanted me to stay in the room until, you know, [the
child] started talking to her mama. And then when she started talking to her
I left the room and she finished telling her mama.


Q. And you said when she started talking to her mother --


A. Uh-huh.


Q. -- are you telling the jury that what she was saying was repeating, basically,
to her mother what she had already told you?


A. Uh-huh.



 Dr. Jeff D. Ezell, a psychologist, testified that he had worked with sexually abused
children for ten years, and that he had examined the complainant on October 6, 1986. From the
beginning of the examination, the child's behavior was "not normal": "[She] intruded herself very
closely into my own space, if you will; rubbed herself against my legs; and I had to repeatedly
admonish her to get back in her seat . . . . She was rather highly agitated; she flipped her dress
up; rubbed her crotch; and exposed her panties." Various psychological tests administered to the
child revealed that



 this child, at the time I saw her, was very preoccupied with a sense of threat
in her environment, of fears, of aggressive retaliation. I felt she was highly
sexually preoccupied . . . .


 . . . .


Q. Doctor, putting all this together now, for the jury, and in summarizing your
finding, were you able to reach an opinion as to whether or not this child had
been sexually abused?


A. Based on her presentation, there was absolutely no doubt in my mind that
this child was sexually abused.


Q. Did she appear to you to have any confusion as to who the perpetrator was?


A. [S]he did, on several occasions, identify the perpetrator as a character named
Bob, and seemed intent on that. There wasn't any contradictions in the story
as she related it.


Q. By that I take it to mean she never identified anyone else other than this Bob
character?


A. That's correct?


 . . . .


Q. Would you describe the ability of a child of this age, four or five years old,
maintaining a continued deception of something as important as who that
perpetrator is, for a long period of time, over psychologists, therapist, family
members and that sort of thing?


A. I think that's quite unlikely. Typically, where there is some coaching or
rehearsal or fabrication, which is strongly suspected or does indeed come to
light, the child verbalizes many inconsistencies, becomes very reluctant to
make statements at all, or makes them in a mechanical parrot-like fashion .
. . .


 . . . .


Q. Doctor, in your opinion was this little girl making up this story?


A. I don't think that she was fabricating the fact of sexual abuse. I have,
myself, no doubt that this child was sexually abused in a fairly severe and
probably a rather chronic way.



 Dr. Beth Nauert, a pediatrician, testified that she interviewed and physically
examined the child on June 5, 1986:



Q. Would you tell the jury exactly what the little girl told you?


A. Yes, sir. I interviewed [the child] alone, and I asked her to tell me about any
touching trouble that she had had. And she told me that she had had some
trouble with Bob; and I asked her, "[W]ho is Bob?" And she said, "[H]e's
my daddy, but he's not my daddy anymore."


 I asked her to tell me what she meant by this, and she said, "Bob touched my
pee-pee and my butt with his finger. He took my clothes off; he took off his
pants and his underwear. He touched his wienie with his fingers."


 I asked her if this occurred once or a few times or a lot of times, and she told
me this had happened "[A] lot of days at my grandma's house and at our
other house."


Q. Did she ever, during this interview, suggest to you that possibly somebody
else might have been involved in touching her?


A. No, sir, she didn't. She did not list any other person or name anyone else.


Q. In your professional experience, did she seem at all confused as to who the
perpetrator might be?


A. No, sir, she didn't. She seemed very clear about that.



Dr. Nauert's physical examination of the child' genital and anal areas revealed abnormalities that
made it "more likely than not that this child has been sexually abused." 

 Ann Elizabeth Stanley, a Travis County mental health therapist, testified that she had
worked with approximately 300 sexually abused children:



Q. What types of things do [these children] do in terms of behavior patterns that
are unusual?


A. There is a whole range of things. Children who have been victims of sexual
abuse at that age, you can expect that they are going to [be] acting out a
whole bunch. That they are going to be testing limits. A lot of times
children at that age will have a real poor sense of boundary. They may come
into my office and just come right up and sit on my lap; look through the
drawers of my desk. You tend to see a whole lot of anxiety and fear.


 As far as watching them with their peers, you might see them fall into a
victim behavior, set themselves up to be the victim. Or you might see them
take on more of the perpetrator role; and maybe sexually act out with other
kids.


 On the other hand, a lot of the kids withdraw and become real quiet and
depressed. And then there are children who exhibit both, who act out. At
one time they are real quiet and depressed. We expect to see a lot of
regressed behavior, children who have stopped wetting the bed all of a
sudden start wetting the bed again; thumb sucking, after they've stopped for
years; nightmares; throwing all kinds of temper tantrums.


 . . . .


Q. Is it common for young children to lie about having been sexually abused?


A. No.


Q. Is it common for them to be confused about who the perpetrator is?


A. No.


 . . . .


Q. How do the small children normally act toward the perpetrator after the event
has occurred?


A. I would say, normally, they act quite fearful of that person.



Stanley testified further that she had spent 21 therapy sessions with the child:



Q. What factors did you consider in reaching your diagnosis?


A. Well, first was the lack of boundaries. That is, [the child] crossing
boundaries and coming into my space. That was indicative of sexual abuse.


 The other part of that was her extreme fear that she was able to verbally say
it to me. That was also something she could talk to me about verbally, and
she represented it through play, also.


 Along with that were some other symptoms of sexual abuse. She talked
about a lot about her vaginal area hurting; her stomach hurting. And that is
very common for children who have been sexually abused.


 . . . .


Q. I think you've already stated your opinion, but let me ask you, what is your
opinion as to the cause of this young girl's abnormal behavior?


A. That she had been sexually abused.


Q. Do you have any doubt, in your own mind?


A. No, I have no doubt.


Q. Okay. I want to ask you now exactly what the little girl told you, as to part
of your diagnosis? What type of statements did she make to you?


A. She made statements as far as the nature of the abuse; in that she made
statements as to "Bob touched my pee-pee," "Bob put his finger in my pee-pee," "Bob touched my pee-pee with his wienie."


 . . . .


Q. Would you give the jury some idea of what level of consistency her reports
to you would be, in talking about the sexual events that happened?


A. Very consistent.


Q. Did she appear, at any time, to be confused or uncertain about who the
perpetrator was?


A. No.


Q. What degree of detail did [she] use?


A. She could . . . give lots of feeling associated with the abuse. And she could
talk about circumstances surrounding the abuse. That is, she could talk
about why she didn't tell, why she was scared to tell, she --


Q. And why was that? Why was she scared . . . to tell?


A. She had a couple of different reasons. One reason was that she was scared
her mom would be mad at her and give her a whipping. Another reason was
that she said Bob threatened to -- I'm using my own words now, but she said
Bob had threatened to kill her and her mom with a knife. That was another
reason that she gave me. 



Videotape


 In points of error one and two, appellant contends that the district court erred by
admitting in evidence the two videotaped interviews. On original submission, we agreed that the
admission of the videotapes was error, but concluded that the error was harmless. Long v. State,
742 S.W.2d 302 (Tex. Crim. App. 1987). We have been instructed by the Court of Criminal
Appeals to reconsider these points of error in light of Briggs v. State, 789 S.W.2d 924 (Tex.
Crim. App. 1990).

 In Long, the Court of Criminal Appeals held that former art. 38.071, authorizing the
use of videotaped testimony by children in certain cases, was unconstitutional on its face. The
court held that the statute denied defendants their constitutional right of confrontation because
cross-examination during the videotaping was impossible. 742 S.W.2d at 317-18. The court also
concluded that the statute violated the guarantees of due process and due course of law by
exposing the accused to the choice of relinquishing his right to call the child victim to the stand
to test her credibility or risking the wrath of the fact finder for subjecting the child to the very
trauma the statute was supposed to prevent. 742 S.W.2d at 321. Finally, the court found the
statute fundamentally unfair because it permitted the State to introduce its primary evidence twice
by allowing both the live and videotaped testimony of the child victim. 742 S.W.2d at 322.

 Long was partially overruled in Briggs. In that case, the Court of Criminal Appeals
concluded that because former art. 38.071 required that the child be available to testify at trial, 
the statute did not facially deny the right of confrontation. The court further noted that if the State
called the child to the stand and, after a few preliminary questions, passed her for cross-examination, the State would neither duplicate its case nor force the accused to endure the stigma
of calling the child to the stand. 789 S.W.2d at 922. Because the statute could be constitutionally
applied, it was not facially unconstitutional. We now must determine whether the statute was
constitutionally applied in this cause.

 The State called the complaining witness to the stand after showing the videotapes
to the jury. After securing her promise to tell the truth, the prosecutor passed the witness for
cross-examination. This procedure was consistent with that deemed constitutional in Briggs. The
child was available for cross-examination, appellant was not forced to call her to the stand, and
the State did not use the child's live testimony to duplicate her videotaped testimony.

 Nevertheless, appellant argues that throughout the trial the State attempted to expose
him to the "wrath of the fact finder" by blaming him for the child's presence in court. Appellant
draws our attention to the following incidents.



1. During his opening statement, the prosecutor told the jury that the "little girl
has been traumatized, and she will probably have to go through an additional
trauma of trial itself."


2. While questioning one of the psychologists who evaluated the child, the
prosecutor asked "what will the trial setting do to this particular individual,
the young child, especially if she has to testify?" The witness answered that
he "had great concern about that," that "every effort should be made to
minimize any further testimony . . . of this child," and that "such courtroom
exposure would very likely set her back."


3. After calling the child to the stand and asking his preliminary questions, the
prosecutor stated, "Your Honor, with great reluctance, we will now pass the
witness."


4. During final arguments, the prosecutors referred to the child "having to be
confronted with this before all these strange people," and asked that the jury
"not hold it against us, here in the D.A.'s office, for sparing that little girl
as much harm as we could spare her. And the way we did, of course, was
by using the video tape, and on re-direct examination limiting our questions
to as few as we possibly could."



Appellant contends that by these remarks and questions, the State sought to make a trial issue of
the trauma to the child resulting from her having to testify, and attempted to place on him the
blame for her presence in court.

 While we find some merit in appellant's contention, we do not believe that the
propriety of the prosecutors' trial tactics is a matter properly before us for review. The question
before us is whether the admission of the videotapes denied appellant his constitutional rights of
confrontation, due process, and due course of law. Appellant objected to the videotapes on this
ground. He did not object to the comments of the prosecutors on this or any other ground.

 We hold that former art. 38.072 was constitutionally applied in this cause. Points
of error one and two are overruled.

Hearsay


 In points of error three through six, appellant contends that the district court erred
by admitting the hearsay testimony of the child's mother, Carla Grady, Beth Nauert, and Ann
Stanley. In the complained-of testimony, each witness testified to statements made by the child
describing the assaultive acts committed against her and identifying appellant as her assailant. On
original submission, we determined that appellant did not preserve points of error three and four
for review. We assumed without deciding that the testimony at issue in points of error five and
six was inadmissible hearsay, but concluded that the error was harmless in light of the other
testimony. The Court of Criminal Appeals held that points of error three and four were preserved
for review, and instructed us to reexamine all four points of error.

 A. Outcry

 The State advances three theories to justify the admission of the challenged
testimony. First, the State urges that the testimony of the child's aunt, Carla Grady, was
admissible under the terms of Tex. Code Crim. Proc. Ann. art. 38.072 (Supp. 1991). This statute
creates an exception to the hearsay rule for statements made by a child abuse victim describing
the alleged offense, if the witness is the first adult to whom the child made such statements. 
Garcia v. State, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). Grady was that person in this
cause. But as we noted on original submission, the State's reliance on art. 38.072 is misplaced
because it failed to lay the procedural predicate required by the statute. Long v. State, 800
S.W.2d 545 (Tex. Crim. App. 1990). Point of error three is sustained.

 B. Prior consistent statement

 The State argues that the testimony of the child's mother was not hearsay because
it was admitted not to prove the truth of the matter stated, but to prove that the child was
consistent in her identification of appellant as her assailant. The admissibility of a prior consistent
statement by a witness is governed by Tex. R. Crim. Evid. Ann. 801(e)(1)(B) (Pamph. 1991). 
See also Tex. R. Crim. Evid. Ann. 612(c) (Pamph. 1991). Under Rule 801(e)(1)(B), a witness's
prior consistent statement is admissible to rebut an express or implied charge of recent fabrication
or improper influence or motive.

 In this cause, appellant's primary defense was that the child's accusations against him
were the product of improper influence by her mother and other members of her family. Thus,
the predicate for admitting a prior consistent statement was established. But to be admissible
under the rule, the prior consistent statement must antedate the improper influence or motive to
fabricate. Campbell v. State, 718 S.W.2d 712, 715-17 (Tex. Crim. App. 1986); 33 Steven Goode
et al., Guide to the Texas Rules of Evidence: Civil and Criminal § 801.4 (Texas Practice 1988). 
None of the hearsay statements at issue in this appeal were shown to have been made by the child
before the alleged improper influence was brought to bear on her. Point of error four is sustained.

 C. Medical diagnosis and treatment

 The State argues that the hearsay testimony of Beth Nauert and Ann Stanley was
admissible under Tex. R. Crim. Evid. Ann. 803(4) (Pamph. 1991). Rule 803(4) creates an
exception to the hearsay rule for "[s]tatements made for purposes of medical diagnosis or
treatment and describing medical history, or past or present symptoms, pain, or sensations, or the
inception or general character of the cause or external source thereof insofar as reasonably
pertinent to diagnosis or treatment."

 The medical treatment exception to the hearsay rule is based on the assumption that
the patient appreciates that the effectiveness of the treatment may depend on the accuracy of the
information provided to the physician. McCormick on Evidence § 292 (Edward Cleary, ed., 3d
ed. 1984). For very young children, however, such logic may break down. A four-year-old
child, such as the victim in this cause, may not understand the need to be truthful with a
physician, nurse, or other care-giver. John Myers, Child Witness Law and Practice § 5.36 at 358
(1987).

 Although no specific inquiry was made in this cause to determine whether the child
appreciated the need to be truthful in her statements to the doctor and psychologist, the record is
sufficient to support such a conclusion. Nauert testified that she interviews children suspected of
being sexual abuse victims before conducting her physical examination. She stated that in such
interviews she "look[s] primarily for not only for what the child tells me but how this -- whether
they seem to be -- whether they seem to be confused or whether they seem to be sure of what
they're saying." Nauert testified that the victim in this cause exhibited no confusion. Stanley
testified, "It was my experience that her mother encouraged her to talk to me about what happened
to her. To always be honest with me. I never got [the] idea that she was being coached or that
she was parroting what somebody else said to her . . . ."

 To be admissible under Rule 803(4), the statement must be reasonably pertinent to
diagnosis or treatment. "Statements as to fault would not ordinarily qualify under this latter
language. Thus a patient's statement that he was struck by an automobile would qualify but not
his statement that the car was driven through a red light." Fed. R. Evid. 803(4) advisory
committee's note. As our Rule 803(4) is based on and identical to the federal rule, it follows that
it was adopted with this understanding. That is the assumption of the commentators. Goode,
supra, § 803.9; 1A Roy R. Ray, Texas Law of Evidence Civil and Criminal §§ 842, 843 (Texas
Practice, 3d ed. 1980 & Supp. 1991).

 A number of courts adhere to the view that, in prosecutions for child sexual abuse,
the child's identification of the abuser is not admissible under the medical exception to the hearsay
rule. But a growing majority of courts find the medical exception to be applicable. Myers, supra,
§ 5.36 at 359-60 (1987 and Supp. 1991). These courts reason that, unlike ordinary medical
problems, the treatment of child abuse includes removing the child from the abusive setting. 
Thus, the identity of the abuser is pertinent to the medical treatment of the child. Id. The opinion
most often cited in support of this view is United States v. Renville, 779 F.2d 430 (8th Cir. 1985). 
The Texas courts addressing this question have ruled in favor of admission. Tissier v. State, 792
S.W.2d 120, 125 (Tex. App. 1990, pet. ref'd); Macias v. State, 776 S.W.2d 255, 258-59 (Tex.
App. 1989, pet. ref'd). See also In re L.S., 748 S.W.2d 571, 576 (Tex. App. 1988, no writ)
(applying civil rule).

 We conclude that the child's statements to Nauert and Stanley describing the abusive
acts and identifying the abuser were reasonably pertinent to medical diagnosis and treatment, and
were properly admitted pursuant to Rule 803(4). Points of error five and six are overruled.




Harm


 In his seventh point of error, appellant contends that the cumulative effect of the
erroneously admitted hearsay evidence discussed in points of error three through six denied him
a fundamentally fair trial. We have overruled points of error five and six. We will limit our
discussion under this point of error to the question whether the erroneous admission of the hearsay
testimony of the child's mother and aunt was harmless error. Tex. R. App. P. Ann. 81(b)
(Pamph. 1991).

 When applying the harmless error rule, a reviewing court should not focus on the
propriety of the outcome of the trial. Instead, it should be concerned with the integrity of the
process leading to the conviction. Harris v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). 
Among the factors to be considered are: the source of the error; the nature of the error; whether
and to what extent the error was emphasized by the State; the collateral implications of the error;
how much weight a juror would probably place upon the error; and whether declaring the error
harmless would encourage the State to repeat it with impunity. Id. 

 The erroneously admitted hearsay testimony of the child's mother and aunt, relating
what the child told them of appellant's activities, was essentially identical to the properly admitted
hearsay testimony of the pediatrician and psychologist. In addition, the jury saw the videotaped
interviews with the child, in which she also described the offensive behavior and identified
appellant as the abuser. Without minimizing the impact of the improper hearsay, in particular that
of the aunt to whom the child first described the abuse, we are satisfied that the State's case would
not have been less persuasive without the erroneously admitted testimony. See Offor v. State, 749
S.W.2d 946 (Tex. App. 1988, pet. ref'd). The prosecutors did not give any particular emphasis
to the improper hearsay during argument. To the contrary, the prosecutors placed their greatest
emphasis on the child's behavior in court and on the videotape, and on the testimony of the
various expert witnesses.

 We do not believe that declaring the errors harmless will encourage the State to
repeat them with impunity. We note in particular that Grady's hearsay testimony was almost
certainly admissible under art. 38.072, had only the prosecuting attorneys been familiar with the
procedural requirements of the statute. In many, if not most, cases of child sexual abuse, the
testimony of the "outcry" witness will be of far more importance than it was in this cause. It is
unlikely that prosecutors will deliberately fail to lay the procedural predicate for this testimony.

 We find beyond a reasonable doubt that the erroneous admission of the hearsay
testimony of the child's mother and aunt did not contribute to the conviction or punishment. Point
of error seven is overruled.

 Because of the error at the punishment stage identified in our previous opinion, the
judgment of conviction is reversed and the cause is remanded to the district court for a new
punishment hearing. Tex. Code Crim. Proc. Ann. art. 44.29(b) (Supp. 1991).



[Before Chief Justice Carroll, Justices Aboussie and Kidd]

Reversed and Remanded on Remand

Filed: November 6, 1991

[Publish]